JOSEPH A. EISENBERG P.C. (Bar No. 52346)
THOMAS M. GEHER (Bar No. 130588)
JEFFER, MANGELS, BUTLER & MARMARO LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California  90067-4308
Telephone:    (310) 203-8080
Facsimile:    (310) 203-0567
Email:        jae@jmbm.com

Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

In re

PENTA WATER COMPANY, INC., a California corporation,

        Debtor.

CASE NO.    09-15145-LT11

Chapter 11

**NOTICE OF MOTION AND AUCTION SALE AND MOTION OF DEBTOR IN POSSESSION:**
**(1) TO CONDUCT AUCTION SALE OF CERTAIN ASSETS OF THE ESTATE;**
**(2) FOR APPROVAL TO SELL TO SUCCESSFUL BIDDER CERTAIN ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES;**
**(3) FOR A DETERMINATION THAT THE SUCCESSFUL BIDDER FOR THE ASSETS IS A "GOOD FAITH" PURCHASER; AND**
**(4) FOR APPROVAL TO ASSUME AND ASSIGN TO SUCCESSFUL BIDDER CERTAIN EXECUTORY CONTRACTS;**

**MEMORANDUM OF POINTS AND AUTHORITIES; AND**

**DECLARATION OF GREGORY L. PROBERT IN SUPPORT THEREOF**

**[11 U.S.C. §§ 105, 363 AND 365]**

**<u>Hearing</u>:**

Date:      March 18, 2010
Time:      2:00 p.m.
Ctrm:      3
        325 West "F" Street
        San Diego, CA 92101

1   **TO THE HONORABLE LAURA S. TAYLOR, UNITED STATES BANKRUPTCY JUDGE, THE**

2   **OFFICIAL COMMITTEE OF UNSECURED CREDITORS, SECURED CREDITORS, THE**

3   **OFFICE OF THE UNITED STATES TRUSTEE, PARTIES REQUESTING SPECIAL NOTICE,**

4   **INTERESTED PARTIES AND THEIR COUNSEL OF RECORD:**

5   **PLEASE TAKE NOTICE** that on March 18, 2010, at 2:00 p.m., or as soon thereafter as the

6   matter can be heard, in the courtroom of the Honorable Laura S. Taylor, United States Bankruptcy

7   Judge, Courtroom 3, 325 West "F" Street, San Diego, California, (i) an auction sale with respect to

8   those "Assets" identified below, and (ii) a hearing with respect to that *Motion of Debtor in*

9   *Possession: (1) To Conduct Auction Sale of Certain Assets of the Estate; (2) For Approval to Sell to*

10  *Successful Bidder Certain Assets of the Estate Free and Clear of Liens, Claims, Interests and*

11  *Encumbrances; (3) For a Determination that the Successful Bidder for the Assets Is a "Good Faith"*

12  *Purchaser; and (4) For Approval to Assume and Assign to Successful Bidder Certain Executory*

13  *Contracts* (the Motion") filed by Penta Water Company, Inc., a California corporation, debtor and

14  debtor in possession in this chapter 11 case ("Debtor"), will be conducted whereby Debtor

15  proposes to

16  1.      Conduct, in open Court, the auction sale (the "Auction") of substantially all of the

17  operating assets of Debtor's bankruptcy estate (the "Assets"), which are itemized below, and sell

18  the Assets in accordance with the terms and conditions of that *Asset Purchase Agreement* (the

19  "APA"), a copy of which is appended as Exhibit "A" to the attached Declaration of Gregory L.

20  Probert (the "Probert Decl.");[1]

21  2.      Obtain an Order of the Court approving the sale of the Assets, free and clear of all

22  liens, claims, interests and encumbrances, to the successful bidder at the Auction;

23  3.      Obtain an Order of the Court approving Debtor's assumption, and assignment to the

24  successful bidder at the Auction, of (a) all purchase orders pending with Debtor (the "Purchase

25  Orders"), and (b) that *License and Manufacturing Agreement* between Debtor (f/k/a Bio-Hydration

---

[1] Debtor reserves the right to reject any and all bids made at the Auction, including, but not limited to, (a) the right to terminate the Auction at any time and (b) to request that the Court approve a sale to a bidder that does not make the "highest" bid at the Auction.

26

27

28

PRINTED ON
RECYCLED PAPER

3721534v1

1   Research Lab, Inc.) and AquaPhotonics, Inc. ("Licensor"), dated as of May 28, 2003, as amended

2   by an Amendment dated May 28, 2003, a further Amendment dated as of February 1, 2004, and

3   by the Amended and Restated License and Manufacturing Agreement dated as of December 26,

4   2006, which was, in turn, amended by an Amendment dated December 26, 2006 (the "License"),

5   which covers the use by Debtor of certain technology utilized in Debtor's bottling and distribution

6   of bottled water, including all benefits, credits and pre-payments attendant to the License; and

7          4.      Obtain an Order of the Court declaring that the successful bidder for the Assets is a

8   "good faith" purchaser and entitled to all of the benefits and protections of section 363(m) of the

9   Bankruptcy Code.

10          Debtor is serving a copy of this Notice of Motion and Motion upon all creditors who assert a

11   general security interest in Debtor's assets, the Official Committee of Unsecured Creditors (the

12   "Committee"), parties requesting special notice and the Office of the United States Trustee, as

13   reflected in the attached proof of service.  A separate Notice of the Motion and the Auction is also

14   being served on all creditors, those two hundred twelve (212) parties to whom Debtor solicited

15   concerning the Assets, and all parties which had expressed an interest in acquiring the Assets.

16   Further, the separate Notice of Motion and Auction is also being published in The Wall Street

17   Journal, San Diego Union Tribune and Los Angeles Times.  Debtor believes and alleges that such

18   notice is appropriate within the meaning of § 102 of the Bankruptcy Code.

19          The Motion is based upon the notice of motion, the Motion itself, the attached

20   memorandum of points and authorities, the Probert Decl., the pleadings and records on file in this

21   case, and upon such other evidentiary matters as may be presented to the Court regarding the

22   Motion.

23          **PLEASE TAKE FURTHER NOTICE** that any opposition to the Auction or Motion must

24   comply with the applicable Local Rules of the United States Bankruptcy Court for the Southern

25   District of California, be filed with the Clerk of the United States Bankruptcy Court located at 325

26   West "F" Street, San Diego, California 92101 and be served on (i) counsel for Debtor, whose name

27   and address are located in the upper left hand corner of the first page of this Motion, and (ii)

28   counsel for the Committee, Karol Denniston, DLA Piper LLP, 550 South Hope Street, Suite 2300,

1  Los Angeles, California 90071, no later than 17 days after the service of this Notice of Motion and

2  Motion.

3      **PLEASE TAKE FURTHER NOTICE** that failure to respond to the Motion may result in the

4  Court granting the relief requested by the Motion.

5

6  Dated:  February 17, 2010        JEFFER, MANGELS, BUTLER & MARMARO LLP

7

8

9                  By:  /s/ Joseph A. Eisenberg

10                     JOSEPH A. EISENBERG P.C.
                       Attorneys for Penta Water Company, Inc.,

11                     Debtor and Debtor in Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

3721534v1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Debtor is a privately-held manufacturer, bottler and distributor of premium ultra-purified water, which is made by a patented cavitation process.

Debtor was compelled to commence this chapter 11 case on account of a variety of legal, financial and business issues, including the burden of Debtor's obligations under its lease for the Carlsbad, California bottling facility. While Debtor needed to reject its lease for the Carlsbad facility, Debtor could not do so immediately upon the commencement of this case because (a) Debtor's redundant machinery and related equipment (the "Bottling Equipment") could not, due to their size and nature, be economically moved and stored, and (b) Debtor could not restore the Carlsbad premises to its landlord until the Bottling Equipment was sold and removed. After Debtor (y) commenced of this chapter 11 case and (z) built up its finished inventory to service customers' future orders, Debtor, with the approval of this Court, sold the Bottling Equipment.[2]

After Debtor had disposed of the Bottling Equipment and built up its inventory to service the continuing needs of its customers, Debtor sought to enter into a co-packaging agreement with a third party for the continued production, bottling and distribution of bottled water. Unfortunately, after evaluating potential co-packaging arrangements, Debtor determined that the capital requirements of entering into a "co-packaging arrangement", including costs associated with moving the required "cavitation" equipment and other start up costs, were overly burdensome and could not be performed from an economic perspective. Thus, Debtor's present inability to produce additional finished product to service the needs and orders of its customers has a negative impact on Debtor's ability to preserve its enterprise or going concern value. Accordingly, to preserve the going concern value of Debtor's enterprise, as well as the value of the Assets and

---

[2] From the sale proceeds of the Bottling Equipment, Debtor has segregated, and continues to maintain, funds sufficient satisfy the lien and secured claim in the estimated sum of $450,000 held by Gregory L. Probert, the Chairman and Chief Executive Officer of Debtor. Additionally, Mr. Probert consents to the Auction and the sale of the Assets free and clear of his lien.

1   the License, Debtor needs to immediately sell the Assets.  If the sale of the Assets is not soon

2   consummated, the going concern value of Debtor's enterprise and the Assets will be adversely

3   impacted.

4        To obtain the highest and best value for the Assets and attempt to reorganize Debtor,

5   Debtor has, as explained in detail below, marketed the Assets and its business to over two

6   hundred potential sponsors of a financial transaction.  Additionally, in connection with the Auction,

7   Debtor will publish notices of the Auction of the Assets in The Wall Street Journal, San Diego Union

8   Tribune and Los Angeles Times.  Thus, Debtor now seeks to (i) conduct, in open Court, an auction

9   sale of the Assets, (ii) sell the Assets to the Auction's successful bidder free and clear of all liens,

10  claims, interests and encumbrances and (iii) assume, and assign to the Auction's successful bidder,

11  the Purchase Orders and License.

12

13                                    **II.**

14                          **STATEMENT OF FACTS**

15  **A.      General Background Facts**

16        Debtor, founded in 1999, and headquartered in Carlsbad, California, is a privately-held

17  manufacturer, bottler and distributor of premium ultra-purified water, which is made by a patented

18  cavitation process.  Debtor markets and sells its specialty water to more than 2,000 health food

19  and grocery stores nationwide and internationally, in such countries as Canada, Japan, Taiwan,

20  Mexico, the United Kingdom and Australia.

21        Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on

22  October 5, 2009 (the "Petition Date").  No trustee or examiner has been appointed in this case,

23  and Debtor continues to manage its assets and conduct it business operations as a debtor in

24  possession pursuant to § § 1107 and 1108 of the Bankruptcy Code.  On October 9, 2009, the

25  Office of the United States Trustee appointed an Official Committee of Creditors Holding

26  Unsecured Claims (the "Committee"), comprised of the following five members: (i) West Coast

27  Container; (ii) Plainfield Direct, Inc.; (iii) Exel Transportation; (iv) Amanda Beard; and (v) NBC

28  Universal, Inc.

PRINTED ON
RECYCLED PAPER

3721534v1

**B.    Debtor's Marketing of the Assets**

Subsequent to the Petition Date, and in order to attract interest in Debtor, and obtain the highest and best price for the Assets, Debtor sent letters to approximately two hundred twelve (212) potential sponsors of a financial transaction, *i.e.*, the funding of plan of reorganization, the infusion of equity capital, the purchase of Debtor or Debtor's assets pursuant to § 363 of the Bankruptcy Code.  The recipients of this letter were strategic buyers, *i.e.*, Coca Cola, Pepsi and Nestle, private equity firms, "turn around" professionals, current and former shareholders of Debtor, high net worth individuals, beverage industry consultants, and referrals from (i) Debtor's suppliers, (ii) the Committee and (iii) Debtor's board of directors.

From this marketing effort, approximately twenty three (23) persons or entities who expressed any interest in Debtor and/or the Assets were sent Confidentiality and Non-Disclosure Agreements ("Confidentiality Agreement") to execute in order to proceed with any due diligence efforts.   Sixteen (16) persons or entities executed and delivered to Debtor a Confidentiality Agreement.  Upon Debtor's receipt of an executed Confidentiality Agreement, Debtor (i) provided such interested parties a package of due diligence materials, (ii) conducted various discussions with such party, and (iii) cooperated with such interested party in their due diligence concerning Debtor's business and the Assets.   Of the sixteen (16) interested parties that executed a Confidentiality Agreement and received due diligence materials, ten (10) of these interested parties conducted further due diligence efforts and expressed different levels of interests in Debtor and/or the Assets.

Also, in a further effort to widely market the Assets and advertise and notify the general public of the Auction, Debtor has published the separate Notice of Motion filed and served in connection with the Auction and Motion in (i) The Wall Street Journal, (ii) San Diego Union Tribune and (iii) Los Angeles Times.

As more than one party has expressed a continuing interest in the purchase of the Assets, Debtor believes that the proposed Auction is the best method to maximize the sales price for the Assets.

## II

## **THE ASSETS**

The Assets consist of Debtor's right, title and interest in the following

A.    The License, which covers the use by Debtor of certain technology utilized in Debtor's bottling, distribution and sale of bottled water (the "Business"), including all benefits, credits and pre-payments attendant to the License (the "Royalty Credit");

B.    All accounts, notes, contracts for payment and all other property rights which would normally be considered "accounts receivable" in accordance with GAAP (the "Accounts Receivable");

C.    All cavitation tanks and purification process line machinery, equipment and fixtures owned or utilized by Debtor ("Equipment");

D.    All intangible property owned, leased to, licensed to or otherwise utilized by Debtor relating to Debtor's Business or the Assets, including, without limitation, the Intellectual Property, as such term is defined by the APA, all warranties and similar guarantees of quality or performance given by third parties in respect of goods delivered or services performed, goodwill, Approvals, as such term is defined by the APA, confidential or proprietary information, covenants not to compete, all designs and works of art used on labels and other packaging of the Inventory, as such term is defined below, all advertising campaign materials, all clinical studies, if any, performed with respect to any of the Assets, vendor numbers and other similar rights and privileges of Debtor with respect to Debtor's customers and any other assets, identifiable or unidentifiable, normally considered an "intangible asset" under GAAP (the "Intangible Assets");

E.    All inventories owned by Debtor relating to the Business, including without limitation, all packaging, finished goods, raw materials, supplies, work in process, spare parts and other miscellaneous items of tangible property normally considered a part of "inventory" under GAAP (the "Inventory") including, but not limited to, Inventory in transit to Debtor at the time of Closing, as such term is defined by the APA, provided that the Inventory in transit must be paid for by the successful purchaser, insofar as Debtor has not paid for same;

1    F.    All rights of Debtor under: (i) the License; and (ii) all open Purchase Orders

2  (collectively, the "Assigned Contracts");

3    G.    All personal property (including parts, furniture and furnishings), other than

4  Equipment, Intangible Assets and Inventory, owned, held or leased by Debtor and which has been

5  or is now used by Debtor in connection with the Business or the Assets (the "Other Personalty");

6    H.    Originals or copies of all books, financial and other records and information

7  which have been reduced to written, recorded or encoded form relating to the Business, the Assets

8  or the Assigned Contracts, including without limitation, customer lists and related sales histories,

9  credit policies and credit information with respect to existing customers, distribution and sales lists,

10  existing cost and pricing data, existing business plans, advertising and promotion plans and

11  materials, product development plans, product advertisement and packaging designs, forecasts,

12  market research reports, competitor information, reference catalogs and product efficacy research

13  in each case in existence as of January 15, 2010, as such items may be modified or augmented in

14  the ordinary course of business (collectively, the "Books and Records");

15    I.    Without limiting the foregoing, and subject to all applicable third party rights

16  of licensors and others, all computer hardware, computer software, computer software

17  documentation, including source code, and systems documentation used in the Business in each

18  case in existence as of March 1, 2010, as such items may be modified or augmented in the

19  ordinary course of business; and

20    J.    All warranties of third parties on any of the Assets.

21    Any and all assets of Debtor and the bankruptcy estate of Debtor that do not

22  constitute Assets are excluded from the Auction (the "Excluded Assets").

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

PRINTED ON
RECYCLED PAPER

3721534v1

### III

### THE AUCTION AND SALE OF THE

### ASSETS SHOULD BE APPROVED

**A.    The Auction Sale of the Assets Satisfies the Standards for Approval of a Sale Outside the Ordinary Course of Business**

Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and hearing, may . . . sell, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Ninth Circuit Court of Appeals has ruled in cases under the Bankruptcy Act that a sale of a debtor's property should be approved if it is in the best interests of the estate and creditors. In re Huntington Ltd., 654 F.2d 578, 589 (9th Cir. 1991); In re Equity Funding Corp., 492 F.2d 793, 794 (9th Cir. 1974). Whether such a transaction is in the best interests of the estate is still a significant factor under the Bankruptcy Code. In re Canyon Partnership, 55 B.R. 520, 526 (Bankr. S. D. Cal. 1985).

In evaluating the propriety of a sale of property of the estate, courts have evaluated whether: (i) a "sound business purpose" justifies the sale; (ii) "accurate and reasonable notice" of the sale was provided; (iii) "the price to be paid is adequate, i.e., fair and reasonable;" and (iv) "good faith, i.e., the absence of any lucrative deals with insiders, is present." In re Copy Crafters Quickprinting, Inc., 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988) and In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987). An examination of each of the above four factors reveals that the Auction and sale of the Assets should be approved.

1.    Sound Business Justification.

Application of the debtor in possession's sound business judgment in the use, sale or lease of property of the estate is subject to great judicial deference. Matter of WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991), aff'd in part, rev'd in part, 983 F.2d 336 (1st Cir. 1993); In re Thrifty Liquors, Inc., 26 B.R. 26, 28 (Bankr. D. Mass. 1982). The application of the business judgment test affords the debtor in possession discretion in balancing the costs and benefits of administering or disposing of estate assets according to the needs of the estate. See, In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985).

PRINTED ON
RECYCLED PAPER

3721534v1

1    Here, the Auction will substantially benefit Debtor, its Estate and all creditors because: (a)

2    the Auction should generate the highest and best price for the Assets; (b) the Auction and related

3    sale will preserve the enterprise or going concern value of Debtor and the Assets; (c) the Estate

4    will be relieved of the costs required to protect, insure and maintain the Assets, and (d) the

5    Auction and related sale will generate money to fund a plan of reorganization and pay allowed

6    claims.

7        2.    Accurate and Reasonable Notice.

8    Pursuant to § 363(b)(1), a debtor in possession must give notice of any sale of property of

9    the estate.  Most transactions not in the ordinary course of business are governed by Federal Rule

10    of Bankruptcy Procedure 6004.  Rule 6004(a) refers, in turn, to Rule 2002(a), which requires a

11    twenty (20) day notice period for any "proposed use, sale, or lease of property of the estate other

12    than in the ordinary course of business, unless the court for cause shown, shortens the time . . . ."

13    F.R.B.P. 2002(a).

14    Debtor has served a Notice of the Auction and Motion on all lienholders, creditors, counsel

15    for the Committee, parties to the License, parties requesting special notice, the Office of the

16    United States Trustee, parties to whom Debtor sent solicitation letters concerning Debtor and the

17    Assets, and anyone who expressed interest in the Assets.  Further, Debtor has caused to be

18    published the separate Notice of Motion filed in connection with the Motion and Auction in (i) The

19    Wall Street Journal, (ii) San Diego Union Tribune, and (iii) Los Angeles Times.  As such, Debtor has

20    satisfied the requirements for accurate and reasonable notice.

21        3.    Adequate Price.

22    While there is presently no established sale price for the Assets, the Auction is designed to

23    allow all interested parties to bid on the Assets, thereby ensuring that the highest and best price is

24    obtained for the Assets.  Additionally, as this Court and Debtor will preside over the Auction, the

25    Court and Debtor, at the conclusion of the Auction, can independently assess whether the highest

26    price offered by a bidder is feasible and acceptable to both Debtor and the Court or whether

27    another bid made at the Auction should be accepted.

28

1    Additionally, the Ninth Circuit has agreed that the "price paid for an asset at a commercially

2 reasonable sale is the best evidence of value." In re The Two S Corporation, 875 F.2d 240, 243

3 (9th Cir. 1989). Due to Debtor's marketing of the Assets and the notice and advertisement of the

4 Auction, the Auction is a commercially reasonable sale and, therefore, the price obtained for the

5 Assets at the Auction is the value of the Assets.

6     4.  Good Faith.

7    Finally, the Auction, and the related sale of the Assets on the terms and conditions set forth

8 in the APA, is proposed in good faith. The "good faith" requirement focuses principally on the

9 element of special treatment of a debtor's insiders in the sale transaction. Industrial Valley, 77

10 B.R. at 21. Here, the Auction is open to all interested bidders, thereby insuring that "insiders" of

11 Debtor are not afforded any special treatment or advantage. Additionally, the Auction and its

12 process will also ensure that all bids are received in an arms-length manner without any collusion.

13    Based on the foregoing, the Auction of the Assets should be approved and allowed to

14 proceed.

15

16               **IV**

17      **THE SALE TO THE SUCCESSFUL BIDDER SHOULD**

18      **BE ORDERED FREE AND CLEAR OF ALL LIENS,**

19      **INTERESTS, CLAIMS AND ENCUMBRANCES**

20    Section 363(f) of the Bankruptcy Code provides, in pertinent part, that

21      [t]he Trustee may sell property . . . free and clear of any interest in such
       property of an entity other than the estate, only if . . . (2) such entity
22      consents; [or] (3) such interest is a lien and the price at which such
       property is to be sold is greater than the aggregate value of all liens on
23      such property . . .

24 11 U.S.C. § 363(f).

25    Here, the sole lien against the Assets is the lien of Mr. Probert, Debtor's Chairman and

26 Chief Executive Officer, in the sum of approximately $450,000. However, from the sale proceeds

27 of Debtor's Bottling Equipment, Debtor has segregated, for the benefit, and satisfaction of the lien,

28

1    of Mr. Probert the sum of $450,000.  Additionally, as set forth in the Probert Decl., Mr. Probert

2    consents to the Auction and related sale of the Assets free and clear of his lien.

3          Accordingly, the sale of the Assets to the successful bidder can be ordered free and clear of

4    all liens, claims, interests and encumbrances.

5

6                                              **V**

7              **THE SUCCESSFUL BIDDER FOR THE ASSETS SHOULD**

8              **BE DEEMED A "GOOD FAITH" PURCHASER**

9          Section 363(m) of the Bankruptcy Code provides that a reversal or modification of a sale

10   order does not effect the validity of a sale to "an entity that purchased ... the property in good

11   faith."

12         "Typically, lack of good faith is shown by fraud, collusion between the purchaser and other

13   bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." In re M

14   Capital Corporation, 290 B.R. 743, 746 (9th Cir. BAP 2003).

15         Here, the successful bidder for the Assets will have obtained the Assets by offering the best

16   bid in an auction setting, thereby eliminating any collusion between Debtor and the successful

17   bidder.  Additionally, it is anticipated that the successful bidder for the Assets will not be an

18   insider, affiliate or creditor of Debtor.  Also, as the Auction is open to all interested parties, the

19   ultimate sale of the Assets will be on an "arm's length" basis.  Debtor, after the sale of the Assets,

20   will not have any interest in the Assets or receive any consideration, other than the purchase price

21   bid by the successful bidder.

22         Thus, the buyer of the Assets will be a "good faith" purchaser entitled to all of the benefits

23   and protections of § 363(m) and this Court should so find.

24   ///

25   ///

26   ///

27   ///

28   ///

## VI

## THE LICENSE AGREEMENT AND OUTSTANDING

## PURCHASE ORDERS CAN BE ASSUMED BY DEBTOR

## AND ASSIGNED TO THE SUCCESSFUL BIDDER

Pursuant to the APA, two of the Assets that are subject to the Auction are the License Agreement and the Purchase Orders, which are executory contracts. Debtor requests an order authorizing Debtor to assume, and assign to the successful bidder, the License Agreement and the Purchase Orders.

Bankruptcy Code § 365(f)(2) provides that a debtor in possession may assign unexpired leases and executory contracts if (i) the debtor in possession assumes such contract and lease, and (ii) adequate assurance of future performance by the assignee of such lease and contract is provided.

First, there is no legal obstacle to the assignment of the License. The Ninth Circuit's decision in In re Catapult Entertainment, Inc., 165 F.3d 747 (9th Cir. 1999), does not bar Debtor from assigning the License because the parties to the License agreed that, and the explicit terms of the License allow, the License to be freely assignable by Debtor.

Second, Debtor is not in default under the License Agreement or any Purchase Order. As there are no cure payments which are required by either the License Agreement or the Purchase Orders, Debtor is able to, and this Court can order Debtor to, assume the License Agreement and the Purchase Orders.

Third, concerning the issue of adequate assurance of future performance, Debtor anticipates that the bidders who will participate in the Auction, including any successful bidder, will be entities with requisite experience necessary to operate the Business and will have the financial capability to perform and comply with the License Agreement and the Purchase Orders. Thus, this Court can authorize Debtor to assign the License Agreement and Purchase Orders to the successful bidder.

Based thereon, in approving the sale of the Assets to the successful bidder, this Court should also authorize and order Debtor to assume, and assign to such successful bidder, the

1    License Agreement and the Purchase Orders.

2

3                                            **VII**

4                                      **CONCLUSION**

5          For the reasons and based upon the arguments and authorities set forth above, Debtor

6    respectfully requests that the Court (a) conduct an auction sale of the Assets, (b) approve the sale

7    of the Assets, in accordance with the terms and conditions of the APA, to the successful bidder

8    free and clear of all liens, claims, interests and encumbrances, (c) authorize Debtor to assume, and

9    assign to the successful bidder, the License Agreement and the Purchase Orders, (d) find that the

10   successful bidder and purchaser of the Assets is a "good faith" purchaser entitled to all of the

11   benefits and protections of Bankruptcy Code § 363(m) and (e) for such other and further relief

12   which this Court deems just and proper.

13

14   DATED:  February 17, 2010              JEFFER, MANGELS, BUTLER & MARMARO LLP

15

16                                         By:  /s/ Joseph A. Eisenberg
                                                JOSEPH A. EISENBERG P.C.
17                                              Attorneys for Penta Water Company, Inc.,
                                                Debtor and Debtor in Possession
18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

3721534v1

1

## DECLARATION OF GREGORY L. PROBERT

2      I, Gregory L. Probert, declare:

3      1.      I am the Chairman and Chief Executive Officer of Penta Water Company, Inc., a

4  California corporation, the debtor and debtor in possession in this chapter 11 case (the "Debtor").

5  I am also a holder of a secured claim against Debtor's estate in the estimated sum of $450,000.

6  Unless otherwise indicated, all facts stated herein are known by me to be true through my own

7  personal knowledge or from my review of the business records maintained by Debtor in the

8  ordinary course of its business and I would and could competently testify thereto in a court of law

9  if called upon to do so.

10      2.      I have read and assisted in the preparation of the Motion to which this declaration

11  is attached.  Undefined capitalized terms used in this declaration have the same meaning as such

12  terms are given in the Motion.

13      3.      As indicated above, certain of the facts set forth in this declaration are based upon

14  Debtor's business records.  The documents and papers which comprise the business records of

15  Debtor are maintained by persons whose duty it is to keep such records accurately and correctly.

16  Said records are created by employees of Debtor by making a written record of each transaction or

17  occurrence which relates to such events at or shortly after the time of such transaction or

18  occurrence.

19

## General Background Facts

20      4.      Debtor, founded in 1999, and headquartered in Carlsbad, California, is a privately-

21  held manufacturer, bottler and distributor of premium ultra-purified water, which is made by a

22  patented cavitation process.  Debtor markets and sells its specialty water to more than 2,000

23  health food and grocery stores nationwide and internationally, in such countries as Canada, Japan,

24  Taiwan, Mexico, the United Kingdom and Australia.

25      5.      Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code

26  on October 5, 2009 (the "Petition Date").  No trustee or examiner has been appointed in this case,

27  and Debtor continues to manage its assets and conduct it business operations as a debtor in

28  possession pursuant to § § 1107 and 1108 of the Bankruptcy Code.  On October 9, 2009, the

PRINTED ON
RECYCLED PAPER

3721534v1

Office of the United States Trustee appointed an Official Committee of Creditors Holding Unsecured Claims (the "Committee"), comprised of the following five members: (i) West Coast Container; (ii) Plainfield Direct, Inc.; (iii) Exel Transportation; (iv) Amanda Beard; and (v) NBC Universal, Inc.

6. Debtor was compelled to commence this chapter 11 case on account of a variety of legal, financial and business issues, including the burden of Debtor's obligations under its lease for the Carlsbad, California bottling facility. While Debtor needed to reject its lease for the Carlsbad facility, Debtor could not do so immediately upon the commencement of this case because (a) Debtor's redundant machinery and related equipment (the "Bottling Equipment") could not, due to their size and nature, be economically moved and stored, and (b) Debtor could not restore the Carlsbad premises to its landlord until the Bottling Equipment was sold and removed. After Debtor (y) commenced of this chapter 11 case and (z) built up its finished inventory to service customers' future orders, Debtor, with the approval of this Court, sold the Bottling Equipment.[3]

7. After Debtor had disposed of the Bottling Equipment and built up its inventory to service the continuing needs of its customers, Debtor sought to enter into a co-packaging agreement with a third party for the continued production, bottling and distribution of bottled water. Unfortunately, after evaluating potential co-packaging arrangements, Debtor determined that the capital requirements of entering into a "co-packaging arrangement", including costs associated with moving the required "cavitation" equipment and other start up costs, were overly burdensome and could not be performed from an economic perspective. Thus, Debtor's present inability to produce additional finished product to service the needs and orders of its customers has a negative impact on Debtor's ability to preserve its enterprise or going concern value. Accordingly, to preserve the going concern value of Debtor's enterprise, as well as the value of the Assets and the License, Debtor needs to immediately sell the Assets. If the sale of the Assets is not soon consummated, the going concern value of Debtor's enterprise and the Assets will be

---

[3] From the sale proceeds of the Bottling Equipment, Debtor has segregated, and continues to maintain, funds sufficient satisfy my lien and secured claim in the estimated sum of $450,000. Additionally, I consent to the Auction and the sale of the Assets free and clear of my lien.

PRINTED ON
RECYCLED PAPER

3721534v1

1    adversely impacted.

2        8.      Thus, to obtain the highest and best value for the Assets and attempt to reorganize

3    Debtor, Debtor seeks to (i) conduct, in open Court, an auction sale of the Assets, (ii) sell the

4    Assets, pursuant to the terms and conditions of the APA, to the Auction's highest or best bidder

5    free and clear of all liens, claims, interests and encumbrances and (iii) assume, and assign to the

6    Auction's successful bidder, the Purchase Orders and License.  Attached hereto as Exhibit "A" and

7    incorporated herein by this reference is the APA, which reflects the terms and conditions of any

8    successful bidder's purchase of the Assets.

9                                **Debtor's Marketing of the Assets**

10       9.      Subsequent to the Petition Date, and in order to attract interest in Debtor, and

11   obtain the highest and best price for the Assets, Debtor sent letters to approximately two hundred

12   twelve (212) potential sponsors of a financial transaction, *i.e.*, the funding of plan of

13   reorganization, the infusion of equity capital, the purchase of Debtor or the Debtor's assets

14   pursuant to § 363 of the Bankruptcy Code.  The recipients of this letter were strategic buyers, *i.e.*,

15   Coca Cola, Pepsi and Nestle, private equity firms, "turn around" professionals, current and former

16   shareholders of Debtor, high net worth individuals, beverage industry consultants, and referrals

17   from (a) Debtor's suppliers, (b) the Committee and (c) Debtor's board of directors.

18       10.     From this marketing effort, approximately twenty three (23) persons or entities who

19   expressed any interest in Debtor and/or the Assets were sent Confidentiality and Non-Disclosure

20   Agreements ("Confidentiality Agreement") to execute in order to proceed with any due diligence

21   efforts.   Sixteen (16) persons or entities executed and delivered to Debtor a Confidentiality

22   Agreement.  Upon Debtor's receipt of an executed Confidentiality Agreement, Debtor (a) provided

23   such interested parties a package of due diligence materials, (b) conducted various discussions

24   with such party, and (c) cooperated with such interested party in their due diligence concerning

25   Debtor's business and the Assets.   Of the sixteen (16) interested parties that executed a

26   Confidentiality Agreement and received due diligence materials, ten (10) of these interested

27   parties conducted further due diligence efforts and expressed different levels of interests in Debtor

28   and/or the Assets.

1    11.    Also, in a further effort to widely market the Assets and advertise and notify the

2    general public of the Auction, Debtor has published the separate Notice of Motion filed and served

3    in connection with the Auction and Motion in (i) The Wall Street Journal, (ii) San Diego Union

4    Tribune and (iii) Los Angeles Times.

5                         **The License And Purchase Orders**

6    12.    To the best of my information and knowledge, the License is presently effective and

7    Licensor has not asserted that there are any defaults under the terms and conditions of the

8    License.    Debtor does not believe there are any existing monetary defaults owing under the

9    License.

10    13.    Concerning the Purchase Orders, Debtor does not believe that any "cure" payments

11    are required to assume and assign the Purchase Orders.

12

13    I declare under penalty of perjury under the laws of the United States of America that the

14    foregoing is true and correct, and that this declaration was executed this 17th day of February

15    2010, at Carlsbad, California.

16

17    GREGORY L. PROBERT

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

3721534v1

- 19 -

# EXHIBIT A

**DRAFT OF 2/10/10**

**ASSET PURCHASE AGREEMENT**

by and between

**PENTA WATER COMPANY, INC.**

and

_____

March ___, 2010

Exhibit A - 20

# TABLE OF CONTENTS

Page

**I DEFINITIONS**..................................................................................................... 1
    1.1    Definitions.......................................................................................... 1
    1.2    Additional Definitions and Construction........................................ 6
    1.3    Headings............................................................................................ 6
    1.4    References to Articles, Etc............................................................... 7
    1.5    References to "Herein," Etc.............................................................. 7

**II PURCHASE PRICE; deposit; ADJUSTMENTS** ........................................... 7
    2.1    Purchase and Sale of the Assets...................................................... 7
    2.2    Excluded Assets. ............................................................................... 8
    2.3    Assumed Liabilities. ......................................................................... 8
    2.4    Excluded Liabilities.......................................................................... 9
    2.5    Purchase Price. .................................................................................. 9
    2.6    Deposit. .............................................................................................. 9
    2.7    Payment of the Purchase Price......................................................... 9
    2.8    Allocation of the Purchase Price...................................................... 9

**III THE CLOSING** ............................................................................................... 10
    3.1    Time and Place of Closing.............................................................. 10
    3.2    Payment of Purchase Price; Deliveries......................................... 10
    3.3    Prorations......................................................................................... 10
    3.4    Sales, Use and Other Taxes. ........................................................... 10
    3.5    Possession of Transferred Assets................................................... 10

**IV REPRESENTATIONS AND WARRANTIES OF THE SELLER**................... 11
    4.1    Organization. ................................................................................... 11
    4.2    Power and Authority. ...................................................................... 11
    4.3    No Violation. .................................................................................... 11
    4.4    Assigned Contracts; No Default. .................................................... 12
    4.5    Intellectual Property........................................................................ 12
    4.6    Actions. ............................................................................................ 12
    4.7    Compliance with Laws. .................................................................. 13
    4.8    Title to Property. ............................................................................. 13
    4.9    Approvals. ........................................................................................ 13
    4.10   Environmental Matters. ................................................................... 14
    4.11   Personal Property; Transferred Equipment.................................. 14
    4.12   Broker's or Finder's Fees............................................................... 14
    4.13   Inventory.......................................................................................... 14
    4.14   Accounts Receivables. .................................................................... 14

**V**      15

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** .............. 15
    5.1    Organization and Good Standing.................................................. 15

| | | | |
|---|---|---|---|
| 5.2 | Power and Authority. | | 15 |
| 5.3 | No Violation. | | 15 |
| 5.4 | Approvals. | | 16 |
| 5.5 | Broker's or Finder's Fees. | | 16 |

**VI COVENANTS OF THE SELLER** .......................................................... 16
| | | | |
|---|---|---|---|
| 6.1 | Conduct of Business. | | 16 |
| 6.2 | Restricted Activities and Transactions. | | 16 |
| 6.3 | Cooperation. | | 17 |
| 6.4 | Confidentiality. | | 17 |
| 6.5 | Notification of Certain Events. | | 17 |

**VII COVENANTS OF THE PURCHASER** .................................................. 18
| | | | |
|---|---|---|---|
| 7.1 | Cooperation. | | 18 |
| 7.2 | Confidentiality. | | 18 |
| 7.3 | Notification of Certain Events. | | 18 |

**VIII AGREEMENTS OF PURCHASER AND SELLER** ................................. 18
| | | | |
|---|---|---|---|
| 8.1 | Employees. | | 18 |
| 8.2 | "AS IS" Transaction. | | 19 |
| 8.3 | No Financing and Due Diligence Contingencies for Purchaser. | | 19 |

**IX CONDITIONS PRECEDENT TO THE PURCHASER'S OBLIGATIONS** ..... 20
| | | | |
|---|---|---|---|
| 9.1 | Truth of Representations and Warranties. | | 20 |
| 9.2 | Performance. | | 20 |
| 9.3 | Approvals. | | 20 |
| 9.4 | Absence of Litigation. | | 20 |
| 9.5 | Deliveries. | | 20 |
| 9.6 | Approval Order.  The Approval Order remains in full force and effect and has not been stayed or modified in any manner, except as consented to by the Purchaser and the Seller. | | 21 |

**X CONDITIONS PRECEDENT TO THE SELLER'S OBLIGATIONS** ............. 21
| | | | |
|---|---|---|---|
| 10.1 | Truth of Representations and Warranties. | | 21 |
| 10.2 | Performance. | | 21 |
| 10.3 | Approvals. | | 21 |
| 10.4 | Absence of Litigation. | | 21 |
| 10.5 | Deliveries. | | 22 |

**COVENANTS AND AGREEMENTS SUBSEQUENT TO THE CLOSING** ....... 22
| | | | |
|---|---|---|---|
| 11.1 | Books and Records; Access. | | 22 |
| 11.2 | Confidentiality. | | 22 |
| 11.3 | Specific Performance; Injunctive Relief. | | 23 |
| 11.4 | Further Assurances. | | 23 |
| 11.5 | Collection of Payments. | | 23 |
| 11.6 | Name Change. | | 23 |
| 11.7 | Maintenance of the Facilities; Retrieval of Transferred Assets. | | 24 |

**XI I SURVIVAL**................................................................................................................24

**XII I TERMINATION** ........................................................................................................24
    13.1    Termination.........................................................................................24
    13.2    Effect of Termination.........................................................................25

**XIV MISCELLANEOUS** ....................................................................................................25
    4.1     Public Announcements. .......................................................................25
    14.2    Amendment; Waiver............................................................................25
    14.3    Fees and Expenses. ............................................................................26
    14.4    Notices. .............................................................................................26
    14.5    Assignment. .......................................................................................27
    14.6    Governing Law; Consent to Jurisdiction. ...........................................27
    14.7    WAIVER OF JURY TRIAL.................................................................28
    14.8    Entire Agreement. ..............................................................................28
    14.9    Severability. ......................................................................................28
    14.10  No Third Party Beneficiaries. ............................................................29
    14.11  Counterparts.......................................................................................29

iii

Exhibit A - 23

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of March __, 2010, is entered into by and between _____ (the "Purchaser") and Penta Water Company, Inc., a California corporation located at 2091 Rutherford Road, Carlsbad, CA 92008 (the "Seller").

### W I T N E S S E T H:

**WHEREAS**, Seller is engaged in the business of bottling and selling water;

**WHEREAS**, upon the terms and subject to the conditions set forth herein, the Seller desires to transfer, sell, convey, assign and deliver to the Purchaser, and the Purchaser desires to acquire from the Seller, certain assets of the Seller;

**WHEREAS**, the Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court"), on October 5, 2009 (the "Petition Date"), Case No. 09-15145-LT11 (the "Bankruptcy Case"), which Bankruptcy Case is currently pending;

**WHEREAS**, after timely and proper notice, a hearing was held before the Bankruptcy Court on March __, 2010, to consider the motion of Seller to sell, transfer, and, assign certain assets of the Seller, at which hearing Purchaser made the highest and best offer to purchase the certain assets of the Seller; and

**WHEREAS**, on March __, 2010, the Bankruptcy Court entered the Approval Order (as hereinafter defined) approving the sale, transfer and assignment of the assets of Seller to Purchaser:

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### I

### DEFINITIONS

1.1     Definitions.

The following terms, as used in this Agreement, shall have the following meanings:

"Accounts Receivable" shall mean all accounts, notes, contracts for payment and all other property rights which would normally be considered "accounts receivable" in accordance with GAAP.

1

"Acquisition Documents" shall mean, collectively, this Agreement, the Bill of Sale, the Assignment Agreements and all agreements, instruments, certificates and other documents executed and delivered in connection herewith or contemplated hereby.

"Action" shall mean any claim, dispute, demand, cause of action or action asserted in any arbitration, litigation, mediation, suit, investigation or other proceeding and any appeal therefrom.

"Agreement" shall mean this Asset Purchase Agreement including all of the Schedules and Exhibits attached hereto.

"Allocation" shall have the meaning ascribed to such term in Section 2.8 hereof.

"Approval" shall mean any approval, authorization, consent, license, franchise, order or permit of or by, notice to, or filing or registration with, a Person.

"Approval Order" shall mean the Order of the Bankruptcy Court which, among other things (a) approved a sale of the Transferred Assets to the Purchaser pursuant to Section 363 of the Bankruptcy Code; and (b) approved the assumption by the Seller and assignment to the Purchaser of all Assigned Contracts which are Executory Contracts and/or the Assigned License in accordance with Sections 365(b) and 365(f) of the Bankruptcy Code.

"Assets" shall mean both the Transferred Assets and the Excluded Assets.

"Assigned Contracts" shall mean those Contracts, attached hereto and made a part hereof as Exhibit A, which the Seller shall assign to the Purchaser pursuant to the terms of this Agreement and the Approval Order.

"Assigned License" shall mean the License and Manufacturing Agreement between Seller (f/k/a Bio-Hydration Research Lab, Inc.) and Licensor dated as of May 28, 2003, as amended by an Amendment dated May 28, 2003, a further Amendment dated as of February 1, 2004, and by the Amended and Restated License and Manufacturing Agreement dated as of December 26, 2006, which was, in turn, amended by an Amendment dated December 26, 2006, which cover the use by the Seller of certain technology utilized in the Business.

"Assignment Agreements" shall mean the instruments of assignment and assumption by the Purchaser of the Assumed Liabilities, substantially in the forms attached hereto as Exhibit B.

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.3 hereof.

"Bankruptcy Case" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bankruptcy Code" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals to this Agreement.

2

"Bill of Sale" shall mean the bill of sale transferring to the Purchaser the Transferred Assets, substantially in the form attached hereto as Exhibit C.

"Books and Records" shall have the meaning ascribed to such term in Section 2.1(h) hereof.

"Business" shall mean the Seller's bottling, distribution and sale of bottled water.

"Business Day" shall mean a day that is not a Saturday, a Sunday or a day on which banks in the State of California are required or authorized to close for regular banking business.

"California Court" shall have the meaning ascribed to such term in Section 14.6(c) hereof.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Closing" shall mean the consummation of the transactions contemplated by this Agreement.

"Closing Date" shall mean the first Business Day, immediately following the entry of the Approval Order, or such other Business Day, as determined by the Seller, which is no later than three (3) Business Days after all of the conditions to Closing described in Article IX and Article X hereof have been fully satisfied or waived by the appropriate party or parties hereto; provided however, without the expressed written consent of the Seller, the Closing Date shall be no later than March __, 2010.

"Closing Purchase Price" shall have the meaning ascribed to such item in Section 2.5(a) hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Contract" shall mean each instrument, contract, license and other agreement, including unexpired leases of personal property, relating to the Business to which the Seller is a party or by which it or any of the Transferred Assets is bound.

"Cure Payments" shall mean all payments required to be made for obligations due prior to the Closing Date with respect to the Assigned Contracts.

"Damages" shall mean any claim, loss, deficiency, Liability, cost or expense (including, without limitation, reasonable attorneys' and accountants' fees, costs and expenses) or damage of any kind or nature whatsoever.

"Deposit" shall have the meaning ascribed to such item in Section 2.6 hereof.

"Designated Account" shall mean the following account: _____.

"Effective Time" shall mean 12:01 a.m. on the Closing Date.

"Environmental Laws" shall mean Laws relating to the protection of the environment and/or human health and safety from environmental effects or to the generation, management, removal, remediation, emission, discharge, control, processing, use, treatment, storage, disposal, transport,

6594579v13

Exhibit A - 26

release, recycling, or handling of Hazardous Materials including, without limitation, CERCLA and the Resource Conservation and Recovery Act (42 U.S.C. section 6901 et seq.) ("RCRA") and the regulations promulgated thereunder.

"Equipment" shall mean each item of machinery, equipment and fixture owned or utilized by the Seller and set forth on Schedule 2.1(c) attached hereto and made a part hereof.

"Excluded Assets" shall mean all of the assets of the Seller that do not constitute Transferred Assets.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.4 hereof.

"Executory Contracts" shall mean all Contracts to which the Seller is a party relating to the Business, the Transferred Assets or the Assigned Contracts entered into prior to the Petition Date that constitute "executory contracts" as such term is used in Section 365 of the Bankruptcy Code.

"GAAP" shall mean generally accepted accounting principles in the United States.

"Governmental Authority" shall mean any foreign, federal, state, local or other governmental, administrative or regulatory authority, body, agency, court, tribunal or similar entity including any arbitrator or arbitration panel.

"Hazardous Materials" means any substance: (i) the presence of which requires or may require investigation, remediation, monitoring or control of any kind under any Environmental Laws; or (ii) which is or becomes regulated or defined as "hazardous waste," "hazardous material," "hazardous substance," "friable asbestos," "radioactive material," "radioactive waste," "low-level radioactive waste," "oil," "petroleum," "petroleum products," or "polychlorinated biphenyls" under any Environmental Law.

"Intangible Assets" shall mean all intangible property owned, leased to, licensed to or otherwise utilized by the Seller relating to the Business or the Transferred Assets, including, without limitation, the Intellectual Property, all warranties and similar guarantees of quality or performance given by third parties in respect of goods delivered or services performed, goodwill, Approvals, confidential or proprietary information, covenants not to compete, all designs and works of art used on labels and other packaging of the Inventory, all advertising campaign materials, all clinical studies, if any,  performed with respect to any of the Transferred Assets, vendor numbers and other similar rights and privileges of Seller with respect to Seller's customers and any other Assets, identifiable or unidentifiable, normally considered an "intangible asset" under GAAP.

"Intellectual Property" shall mean all of the following irrespective of where any of the same were issued, are pending or exist that are owned by, issued to, leased or licensed to or otherwise utilized by the Seller: United States and foreign patents of any description, and applications therefor; United States (federal and state) and foreign trademarks (and goodwill associated therewith); the trade name "Penta" and other trade names, labels, trade dress, advertising and package designs, and other trade rights, whether or not registered and all applications therefor; United States and foreign copyrights, whether or not registered and all applications therefor (including copyrights in computer software and computer software documentation, source code

4

and systems documentation); Internet domain names, Web sites, URLs, know-how, trade secrets, business leads, research and results thereof, technology, techniques, data, methods, processes, instructions, drawings and specifications, inventions, discoveries, improvements, designs, processes, formulae, recipes, whether patented or patentable or not (whether or not such items have been reduced to written, computer-readable or other tangible form); shop rights and license agreements and other agreements of every kind and character relating to any of the foregoing; and all claims and causes of action relating to any of the foregoing, including claims and causes of action for past infringement.

"Inventory" shall mean all inventories owned by the Seller relating to the Business, including without limitation, all packaging, finished goods, raw materials, supplies, work in process, spare parts and other miscellaneous items of tangible property normally considered a part of "inventory" owned by the Seller under GAAP.

"IRS" shall mean the Internal Revenue Service.

"JMBM" shall mean Jeffer, Mangels, Butler & Marmaro LLP.

"Law" shall mean any law, statute, rule, regulation, ordinance, standard, requirement, administrative ruling, order or process promulgated by any Governmental Authority as in effect from time to time (including, without limitation, any zoning or land use law or ordinance, building code, Environmental Law, securities, blue sky, civil rights or occupational health and safety law or regulation and any court, administrative agency or arbitrator's order or process).

"Liability" shall mean any debt, liability, commitment and guaranty, warranty or obligation of any kind, character or nature whatsoever, whether known or unknown, secured or unsecured, accrued, fixed, absolute, potential, contingent or otherwise, and whether due or to become due.

"Licensor" shall mean AquaPhotonics, Inc., the licensor under the Assigned License.

"Lien" shall mean any lien, statutory lien, pledge, mortgage, security interest, charge, easement, right of way, covenant, claim, restriction, right, option, conditional sale or other title retention agreement, or encumbrance of any kind or nature.

"Other Personalty" shall mean all personal property (including parts, furniture and furnishings), other than Equipment, Intangible Assets and Inventory, owned, held or leased by the Seller and which has been or is now used by the Seller in connection with the Business or the Transferred Assets.

"Other Taxes" shall have the meaning ascribed to such term in Section 3.4 hereof.

"Permitted Lien" shall mean Lien or right retained by the licensor or lessor under any Assigned Contract.

"Person" shall mean any individual, general or limited partnership, corporation, limited liability company, association, business trust, joint venture, Governmental Authority, business entity or other entity of any kind or nature.

"Post-Closing Occupancy Payment" shall have the meaning ascribed to such term in Section 11.7 hereof.

"Petition Date" shall have the meaning ascribed to such term in the recitals to this Agreement.

"Purchaser" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Purchaser Recipients" shall have the meaning ascribed to such term in Section 7.2 hereof.

"Representative" shall mean, with respect to a Person, any employee, officer, director, stockholder, partner, accountant, attorney, investment banker, broker, finder, investor, subcontractor, consultant or other authorized agent or representative of such Person.

"Royalty Credit" shall mean all benefits, credits and pre-payments attendant to the Assigned License.

"Seller" shall have the meaning ascribed to such term in the preamble to this Agreement.

"Seller Recipients" shall have the meaning ascribed to such term in Section 6.4 hereof.

"Tax Return" shall mean any return, report, declaration, claim for refund, estimate, election, or information statement or return relating to any Tax, including any schedule or attachment thereto, and any amendment thereof.

"Transactions" shall mean the Transfer of the Transferred Assets by the Seller to the Purchaser and the assignment by the Seller to the Purchaser of the Assigned Contracts to the Seller as contemplated by the Transaction Documents.

"Transfer" shall mean any sale, transfer, conveyance, assignment, delivery or other disposition, and "Transfer" or "Transferred," used as a verb, shall each have a correlative meaning.

"Transferred Assets" shall have the meaning ascribed to such term in Section 2.1 hereof.

"Transferred Equipment" shall have the meaning ascribed to such term in Section 2.1(c) hereof.

"Vacancy Date" shall have the meaning ascribed to such term in Section 11.7 hereof.

1.2    Additional Definitions and Construction.

In addition to the foregoing defined terms, (i) other capitalized terms appearing in this Agreement shall have the respective meanings ascribed to such terms where they first appear in the text of this Agreement and (ii) all accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP.

1.3    Headings.

6

Exhibit A - 29

The headings contained in this Agreement are for convenience of reference only and shall not constitute a part hereof or define, limit or otherwise affect the meaning of any of the terms or provisions hereof.

1.4    References to Articles, Etc.

All references herein to Articles, Sections, Exhibits and Schedules shall be to Articles and Sections of and Exhibits and Schedules to this Agreement.

1.5    References to "Herein," Etc.

As used in this Agreement, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this Agreement as a whole, and not to any particular section, provision or subdivision of this Agreement.

## II

## PURCHASE PRICE; DEPOSIT; ADJUSTMENTS

2.1    Purchase and Sale of the Assets.

Subject to the terms and conditions of this Agreement, at and as of the Effective Time, the Seller shall Transfer to the Purchaser, and the Purchaser shall purchase and accept from the Seller, free and clear of all Liens (other than Permitted Liens), all of the Seller's right, title and interest in and to those assets of the Seller, only to the extent of Seller's interest therein, as set forth below (collectively, the "Transferred Assets"):

(a)    the Assigned License, including the Royalty Credit thereon;

(b)    the Accounts Receivable;

(c)    all cavitation tanks and purification process line Equipments owned or leased by the Seller, including those items of Equipment as set forth on Schedule 2.1(c) (the "Transferred Equipment");

(d)    all Intangible Assets including but not limited to the items set forth on Schedule 2.1(d);

(e)    all Inventory including, but not limited to, Inventory in transit to Seller at the time of Closing, by Purchaser; provided that the Inventory in transit must be paid for by Purchaser, insofar as Seller has not paid for same;

(f)    all rights of the Seller under: (i) the Assigned License; and (ii) all open purchase orders, including but not limited to the open purchase orders set forth on Schedule 2.1(f) (collectively, the "Assigned Contracts");

(g)    the Other Personalty including, but not limited to, the items set forth on Schedule 2.1(g);

Exhibit A - 30

(h)    originals or copies of all books, financial and other records and information which has been reduced to written, recorded or encoded form relating to the Business, the Transferred Assets or the Assigned Contracts, including without limitation, customer lists and related sales histories, credit policies and credit information with respect to existing customers, distribution and sales lists, existing cost and pricing data, existing business plans, advertising and promotion plans and materials, product development plans, product advertisement and packaging designs, forecasts, market research reports, competitor information, reference catalogs and product efficacy research in each case in existence as of March 1, 2010, as such items may be modified or augmented in the ordinary course of business (collectively, the "Books and Records");

(i)    without limiting the foregoing, and subject to all applicable third party rights of licensors and others, all computer hardware, computer software, computer software documentation, including source code, and systems documentation used in the Business in each case in existence as of March 1, 2010, as such items may be modified or augmented in the ordinary course of business; and

(j)    any warranties of third parties on any Transferred Assets.

2.2    Excluded Assets.

Notwithstanding anything to the contrary contained herein, including Section 2.1 above, the Seller shall retain all of its right, title and interest in and to, and shall not Transfer to the Purchaser, all Assets of the Seller that are not Transferred Assets, including, but not limited to the following (collectively, the "Excluded Assets"):

(a)    all cash, cash equivalents, bank deposits, tax refunds and all security deposits, prepaid expenses (other than the Royalty Credit), warranties of third parties on Excluded Assets, Actions, all insurance proceeds and insurance claims, and all rights and assets relating to the Excluded Assets;

(b)    all Contracts which are not Assigned Contracts;

(c)    all real property leases and all licenses other than the Assigned License; and

(d)    all: (i) rights and claims of the of the Bankruptcy Estate of the Seller under Sections 544 through and including Section 553 of the Bankruptcy Code; (ii) except for the Transferred Actions or as otherwise expressly provided elsewhere in this Agreement, all Actions, insurance proceeds and insurance claims not relating to the operation of the Business or the utilization of the Transferred Assets.

2.3    Assumed Liabilities.

Subject to the terms and conditions of this Agreement, at and as of the Effective Time, the Purchaser shall assume and agree to pay, perform, discharge and satisfy when due only the following Liabilities of the Seller arising out of or relating to the Assigned Contracts: (a) those Liabilities which arise or accrue pre-Effective Time and are expressly listed in Exhibit A

and (b) those Liabilities, according to the terms of any Assigned Contract, which relate to periods after the Effective Time or which accrue after the Effective Time and are to be paid, performed or satisfied after the Effective Time (the Liabilities described in the foregoing clauses (a) and (b) are collectively defined herein as the "<u>Assumed Liabilities</u>"). Purchaser shall assume and pay any Liabilities of the Seller for the payment of any Cure Payments due under the Assigned Contracts. Notwithstanding anything to the contrary contained herein, except for the Assumed Liabilities, Purchaser shall not assume or otherwise become liable for any Liability of Seller, whether or not relating to the Assigned Contracts.

2.4    <u>Excluded Liabilities.</u>

Except for the Assumed Liabilities, the Purchaser shall not assume, and shall have no liability or obligation whatsoever at any time for any or all Liabilities of the Seller arising prior to or after the Effective Time from the operation of, or any act or omission occurring in respect of, the Business, the Assigned Contracts or the use or ownership of the Transferred Assets (collectively, the "<u>Excluded Liabilities</u>").

2.5    <u>Purchase Price.</u>

(a)    The purchase price to be paid by the Purchaser to the Seller for the Transferred Assets consist of the sum of the following:

(i)    _____ Dollars ($_____) in cash (the "<u>Closing Purchase Price</u>") , and

(ii)    The assumption of the Assumed Liabilities, subject to adjustment ((i) and (ii), collectively, the "<u>Purchase Price</u>").

2.6    <u>Deposit.</u>

The Purchaser has delivered to JMBM the sum of _____ Dollars ($___, ___), receipt of which is hereby acknowledged (the "<u>Deposit</u>"). The Deposit shall be disbursed as follows at Closing in accordance with Section 2.7 below.

2.7    <u>Payment of the Purchase Price.</u>

At the Closing, in addition to Purchaser's assumption of the Assumed Liabilities, the Purchaser shall deliver or cause to be delivered to the Designated Account the Closing Purchase Price consisting of :

(a)    the Deposit; and

(b)    the difference between Closing Purchase Price and the amount of the Deposit.

2.8    <u>Allocation of the Purchase Price.</u>

Prior to the Closing, the Seller and the Purchaser shall agree as to the allocation of the total Purchase Price pursuant to Section 1060 of the Code and the regulations thereunder (the "Allocation"). The Purchaser and Seller agree to use such Allocation in filing all required forms under Section 1060 of the Code and not take any position inconsistent with such Allocation upon any examination of any such Tax Return, in any refund claim or in any tax litigation.

## III

## THE CLOSING

### 3.1    Time and Place of Closing.

If all the conditions to Closing set forth in this Agreement have been satisfied or waived in writing prior to such date, the Closing shall take place at 10:00 a.m., California time, on the Closing Date at the offices of Jeffer, Mangels, Butler & Marmaro LLP in Los Angeles, California, or at such other time or place as may be mutually agreed upon by the parties hereto. The Closing, the Transfer of the Transferred Assets, the effectiveness of the documents, agreements and certificates delivered in accordance with this Agreement, and the consummation of the transactions contemplated hereby shall be deemed to occur at the Effective Time.

### 3.2    Payment of Purchase Price; Deliveries.

At the Closing, the Purchaser shall pay and deliver, or cause to be paid or delivered, the Closing Purchase Price in accordance with Section 2.7 above, the Post-Closing Occupancy Payment in accordance with Section 11.7 below and the parties hereto shall deliver such documents as required by Article IX and Article X hereof.

### 3.3    Prorations.

Assumed Liabilities which are not determinable under the Assigned Contracts to arise or accrue during the pre-Effective Time period, which straddle the Closing Date or are not expressly allocated between pre- and post-Effective Time periods, shall be prorated between Seller and Purchaser as of the Closing Date based upon fractions whereby the pre-and post-Effective Time Periods covered by such Assumed Liabilities are the numerator and the total time period covered by such Assumed Liabilities are the denominator. All amounts due in respect of periods prior to the Effective Time shall be paid in full or otherwise satisfied by Seller and all obligations due in respect of periods after the Effective Time shall be paid in full or otherwise satisfied by Purchaser.

### 3.4    Sales, Use and Other Taxes.

Purchaser agrees to pay all sales, use, purchase, transfer, fixed asset, stamp, documentary stamp, use or other taxes which may be payable by reason of the sale of the Transferred Assets under this Agreement or the transactions contemplated herein ("Other Taxes").

### 3.5    Possession of Transferred Assets.

10

Possession of the Transferred Assets shall be deemed to transfer to Purchaser at the Effective Time on the Closing Date. Seller shall transfer and deliver to Purchaser on the Closing Date such keys, lock and safe combinations and other similar items as Purchaser shall require to obtain immediate and full possession and control of the Transferred Assets, and shall also make available to Purchaser all Books and Records or other documents that are required to be transferred to Purchaser by this Agreement on the Closing Date.

## IV

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

As an inducement to the Purchaser to enter into this Agreement, Seller hereby represents and warrants as follows:

### 4.1    Organization.

The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California, its jurisdiction of incorporation and, subject to the effect of the Bankruptcy Case, has the requisite power and authority to own, operate and lease its properties and assets and to conduct the Business as they are now being owned, operated, leased and conducted. The Seller is duly qualified or licensed to do business as a foreign corporation and is in good standing in such other jurisdictions as the conduct of its Business requires.

### 4.2    Power and Authority.

Subject to the effect of the Bankruptcy Case, the Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other Acquisition Documents to which it is a party and, subject to the entry of the Approval Order, perform its obligations hereunder and thereunder and consummate the Transactions. The execution and delivery by the Seller of this Agreement and the other Acquisition Documents to which it is a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby have been duly authorized by all necessary corporate actions on the part of the Seller. Subject to Bankruptcy Court approval, this Agreement and each other Acquisition Document to which the Seller is a party will constitute, upon the mutual execution and delivery thereof, the legal, valid and binding obligation of the Seller, enforceable against it in accordance with its terms.

### 4.3    No Violation.

Except as set forth on Schedule 4.3, neither the execution and delivery by the Seller of this Agreement or any other Acquisition Document to which the Seller is a party, the performance by the Seller of its obligations hereunder or thereunder, nor the consummation by the Seller of the transactions contemplated hereby or thereby, will (a) contravene any provision of the article of incorporation or bylaws of the Seller; (b) with or without the giving of notice or the lapse of time or both, violate, be in conflict with, constitute a default under, permit the termination of, require the Approval of any other party to, constitute a breach of, or create a Liability or loss of a benefit under any Assigned Contract; (c) violate or conflict with, any Law or any judgment, decree or order of any Governmental Authority to which the Seller is subject or

11

by which the Seller or any of its Assets or properties is bound; or (d) result in the loss of any material Approval necessary to or benefiting the Business.

    4.4    <u>Assigned Contracts; No Default</u>.

        Schedule 2.1(f) lists all Assigned Contracts. The Seller has delivered or made available to the Purchaser a true and complete copy of each of the Assigned Contracts. Except for the types of defaults set forth in Section 365(c) of the Bankruptcy Code, and except as set forth on <u>Schedule 4.4</u>, the Seller and to the Seller's Knowledge, each other party thereto has performed or is now performing in all material respects its obligations under, and is not in material default (and would not, by the lapse of time or the giving of notice or both, be in material default) under, or in breach or violation of, nor has the Seller received notice of any asserted claim of a default by the Seller under, or a breach or violation by the Seller of, any of the material Assigned Contracts to which it is a party. Seller shall list on <u>Schedule 4.4</u> all defaults relating to Executory Contracts that are Assigned Contracts, which defaults are required to be cured by the Seller pursuant to Section 365(b)(1) of the Bankruptcy Code before such Executory Contracts can be assumed by the Seller and assigned to the Purchaser.

    4.5    <u>Intellectual Property</u>.

        Schedule 4.5 sets forth a true and complete list of all patents and applications therefor, all applications and registrations for all trademarks, trade names, domain names, Web sites and copyrights included in the Intellectual Property, all pending applications therefore and all licenses and other agreements relating thereto to which Seller is a party, whether as licensor or licensee or otherwise. Except as set forth on <u>Schedule 4.5</u>, the Seller owns or otherwise has the right or license to use the Intellectual Property, free and clear of all Liens (except for Permitted Liens). <u>Schedule 4.5</u> accurately identifies any Intellectual Property licensed to the Seller, if any, and all agreements to which Seller is a party restricting or otherwise modifying the Seller's sole right to use any Intellectual Property. As set forth on <u>Schedule 4.5</u>:

        (a)    As a consequence of Section 365 of the Bankruptcy Code and the expressed terms of the Approval Order, no Approval of any third party will be required for the use by the Purchaser of any of the Intellectual Property or the Transfer of the Seller's rights therein to the Purchaser;

        (b)    no claims are currently being asserted by any Person involving or questioning the Seller's right to use any of the Intellectual Property or challenging or questioning the validity or effectiveness of any license or similar agreement related to the Intellectual Property; and

        (c)    to Seller's Knowledge, the use of the Intellectual Property by the Seller does not infringe the rights of any Person nor, to the Seller's Knowledge, is any infringing use of the Intellectual Property currently ongoing by any Person.

    4.6    <u>Actions</u>.

        Except as set forth on <u>Schedule 4.6</u>, there is no Action pending or, to Seller's Knowledge, threatened, against the Seller relating to the Business or any Transferred Asset,

12

before any Governmental Authority which questions or challenges the validity of this Agreement or the other Acquisition Documents or any action taken or proposed to be taken by the Seller pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby, or would, if adversely determined, have a material adverse effect on the Seller or the Transferred Assets.

4.7     Compliance with Laws.

Except as set forth on Schedule 4.7, to Seller's Knowledge:

(a)     the Seller has complied with all Laws binding on it relating to the Business or the Transferred Assets, except where such failure to comply would not have a material effect on the Business or the Transferred Assets;

(b)     the Seller has not been charged with or threatened in writing with, any charge concerning, nor is the Seller under any investigation with respect to, any violation of any provision of any material Law relating to the Business or the Transferred Assets, and

(c)     the Seller is not in violation of, or in default under, and no event has occurred which, with the lapse of time or the giving of notice, or both, would result in the violation of or default under, the terms of any judgment, decree, order, injunction or writ of any Governmental Authority relating to the Transferred Assets or the Business.

4.8     Title to Property.

Except as set forth on Schedule 4.8, the Seller will have at the Closing Date good and marketable title to, a license to utilize or leasehold interest in, all of the Transferred Assets (whether personal, tangible or intangible, and including specifically all Intellectual Property), free and clear of all Liens (except for Permitted Liens).

4.9     Approvals.

(a)     Except for the Approval Order, or as set forth on Schedule 4.9(a), no Approval of any Governmental Authority or other Person is required to be made, obtained or given by or with respect to the Seller in connection with the execution or delivery by the Seller of this Agreement and the other Acquisition Documents to which it is a party, the performance by it of its obligations hereunder or thereunder or the consummation by it of the transactions contemplated hereby or thereby, including without limitation the Transfer of the Transferred Assets to the Purchaser. The Approvals listed on Schedule 4.9(a) will be obtained, made or given, as appropriate, on or prior to the Closing Date, except as otherwise provided in this Agreement.

(b)     The Seller has all Approvals required for the operation of the Business and the use and ownership or leasing of the Transferred Assets, as currently operated, used, owned or leased; all of such Approvals (except with respect to environmental matters) are listed on Schedule 4.9(a) and are valid, in full force and effect and in good standing; there is no Action pending or, to Seller's Knowledge, threatened, that disputes the validity of any such Approval or that is likely to result in the revocation, cancellation or suspension, or any adverse modification

13

of, any such Approval, except where the failure of any of the foregoing would not have a material adverse effect on the Transferred Assets or the Business.

4.10    Environmental Matters.

Except as set forth on Schedule 4.10, to Seller's Knowledge:

(a)    the Transferred Assets and operations of the Business are, and have been, in material compliance with all Environmental Laws and with all requirements of applicable Approvals issued pursuant to Environmental Laws;

(b)    during the last five (5) years, the Seller has not received any notice from any Governmental Authority or other Person claiming any violation of or potential Liability under Environmental Laws in respect of the Business or the Transferred Assets; and

(c)    to Seller's Knowledge, there are no Hazardous Materials on any premises where the Seller is conducting its Business.

4.11    Personal Property; Transferred Equipment.

To Seller's Knowledge, the Transferred Equipment and Other Personalty set forth on Schedules 2.1(c) and 2.1(g), respectively, are in good and serviceable condition, ordinary wear and tear excepted.

4.12    Broker's or Finder's Fees.

The Seller has not authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement or any of the other Acquisition Documents.

4.13    Inventory.

Except as set forth on Schedule 4.13, to Seller's Knowledge, the Inventory (a) is of good and merchantable quality, and (b) is salable and usable for the purpose for which it was procured or manufactured.

4.14    Accounts Receivables.

Except as set forth in such Schedule 4.14, to Seller's Knowledge, all Accounts Receivable existing as of the date hereof:  (a) arose in the ordinary course of business in bona fide transactions and (b) constitute only valid claims which, subject to the reserves set forth on Schedule 4.14, are not subject to valid counterclaims, set-offs or outstanding disputes.

# V

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

As an inducement to Seller to enter into this Agreement, Purchaser hereby represents and warrants as follows:

### 5.1    Organization and Good Standing.

Purchaser is a {limited liability company} duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite corporate power and authority to own, operate and lease its properties and assets and to conduct its business as they are now being owned, operated, leased and conducted. Purchaser is duly qualified or licensed to do business as a foreign corporation and is in good standing in every jurisdiction where such qualification is material to the Business.

### 5.2    Power and Authority.

Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and the other Acquisition Documents, perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby. The execution and delivery by Purchaser of this Agreement and the other Acquisition Documents to which it is a party, the performance by it of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate actions on the part of Purchaser. This Agreement and each other Acquisition Document to which Purchaser is a party will constitute upon the mutual execution and delivery thereof the legal, valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

### 5.3    No Violation.

Neither the execution and delivery by Purchaser of this Agreement or any of the other Acquisition Documents to which it is a party, the performance by it of its obligations hereunder or thereunder, nor the consummation by it of the transactions contemplated hereby or thereby, will (a) contravene any provision of the certificate of incorporation and bylaws of Purchaser; (b) with or without the giving of notice or the lapse of time or both, violate, be in conflict with, constitute a default under, permit the termination of, cause the acceleration of the maturity of any debt or obligation of Purchaser, require the Approval of any other party to, constitute a breach of, create a Liability or loss of a benefit under, any contract to which it is a party or by which it or any of its assets or properties are bound, other than such violations, conflicts, defaults, terminations, accelerations, breaches, Liabilities or loss of benefits which will be cured prior to or concurrently with the Closing; (c) result in the creation or imposition of any Lien upon any of the properties or assets of Purchaser, or (d) violate, conflict with or require any Approval under, any Law or any judgment, decree or order of any Governmental Authority to which Purchaser is subject or by which it or any of its assets or properties are bound.

5.4    Approvals.

Except for Approval of the Bankruptcy Court, no Approval of any Governmental Authority or other Person is required to be made, obtained or given by or with respect to the Purchaser in connection with the execution or delivery by it of this Agreement and the other Acquisition Documents, the performance by it of its obligations hereunder or thereunder or the consummation by it of the transactions contemplated hereby or thereby.

5.5    Broker's or Finder's Fees.

Neither Purchaser nor any of its Affiliates has authorized any Person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such Person to any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement or any of the other Acquisition Documents.

## VI

## COVENANTS OF THE SELLER

The Seller hereby covenants and agrees that, subject to the orders and direction of the Bankruptcy Court and except as otherwise consented to in writing by the Purchaser or actions contemplated by or relating to the transactions contemplated by this Agreement or disclosed on the Schedules hereto, from and after the date hereof until the Closing:

6.1    Conduct of Business.

Shall carry on the Business in the ordinary course as conducted immediately prior to the date of this Agreement.

6.2    Restricted Activities and Transactions.

The Seller shall not engage, or agree to engage, in any one or more of the following activities or transactions, except in the ordinary course of business, without the prior written permission of the Purchaser:

(a)    enter into or amend in any material respect or reject pursuant to Section 365 of the Bankruptcy Code any Executory Contract that is an Assigned Contract or any license of, or any other right to, Intellectual Property listed on Schedule 4.6;

(b)    settle any lawsuit or claim if such settlement imposes any continuing Liability or non-monetary obligation on the Business or any of the Transferred Assets;

(c)    waive any material claims or rights relating to the Transferred Assets or the Business;

(d)    remove any item of Equipment or Other Personalty (other than Inventory sold in the ordinary course and Excluded Assets) from the premises on which the Business is conducted; or

(e)    knowingly take any action or omit to take any action that would cause the representations and warranties of the Seller contained in Article IV hereof to be untrue, inaccurate or misleading.

6.3    Cooperation.

The Seller shall use its best reasonable efforts (but without the need to incur any unusual or unreasonable fees, costs or expenses) to cause the transactions contemplated by this Agreement to be consummated, including, without limitation, (a) causing to become effective the Approval Order, obtaining the other Approvals of such Governmental Authorities and other Persons as may be necessary or reasonably requested by the Purchaser in order to consummate the transactions contemplated by this Agreement and (b) giving prompt written notice to the Purchaser of (i) any notice of, or other communication relating to, any material default, or any event which, with the giving of notice or the lapse of time or both, would become a default, under any Contract, and (ii) any written notice or other communication from any Person alleging that the Approval of such Person is or may be required in connection with the execution and delivery of this Agreement or the other Acquisition Documents or the consummation of the transactions contemplated hereby or thereby.

6.4    Confidentiality.

The Seller shall, and shall cause each of its Representatives (collectively, the "Seller Recipients") to keep confidential and not use or disclose to others any proprietary information of or obtained from, the Purchaser or its Representatives, to the extent that such proprietary information is not or does not become readily available to the public other than as a result of disclosure by the Purchaser or its Representatives or is not required to be disclosed by applicable Law, court order or to the extent necessary in a proceeding before the Bankruptcy Court to consummate this Agreement.  Promptly after the Closing or in the event of the termination of this Agreement without a Closing, the Seller shall, and shall cause each of the other Seller Recipients to, promptly return to the Purchaser all, and not retain any copies of, such written, recorded or encoded proprietary information.  Seller shall be responsible for any breach of this Section 6.4 by any of the Seller Recipients and agrees, at its sole expense, to take all reasonable measures (including, without limitation, court proceedings) to restrain the Seller Recipients from prohibited or unauthorized disclosure or use of such proprietary information.

6.5    Notification of Certain Events.

The Seller shall give the Purchaser immediate notice of the occurrence of any event or events which constitute a violation of any of the provisions of this Article VI.

17

# VII

## COVENANTS OF THE PURCHASER

The Purchaser hereby covenants and agrees that, except as otherwise consented to in writing by the Seller, from and after the date hereof until the Closing:

### 7.1    Cooperation.

The Purchaser shall use its best reasonable efforts (but without the need to incur any unreasonable or unusual fees, costs or expenses) to cause the Transactions to be consummated, including, without limitation, (a) causing to become effective the Approval Order, obtaining the other Approvals of such Governmental Authorities and other Persons as may be necessary or reasonably requested by the Seller in order to consummate the transactions contemplated by this Agreement, and (c) giving prompt notice to the Seller of (i) any notice of, or other communication relating to, any material default, or any event which, with the giving of notice or the lapse of time or both, would become a default, under any Contract, and (ii) any written notice or other communication from any Person alleging that the Approval of such Person is or may be required in connection with the execution and delivery of this Agreement or the other Acquisition Documents or the consummation of the transactions contemplated hereby or thereby.

### 7.2    Confidentiality.

The Purchaser shall, and shall cause each of its Representatives (collectively, the "Purchaser Recipients") to, keep confidential, and not use or disclose to others, any proprietary information of or obtained from the Seller or its Representatives, to the extent that such proprietary information is not or does not become readily available to the public other than as a result of disclosure by the Purchaser or its Representatives or is not required to be disclosed by applicable Law or court order.  In the event of the termination of this Agreement without a Closing, the Purchaser shall, and shall cause each of the other Purchaser Recipients to, promptly return to the Seller all, and not retain any copies of, such written, recorded or encoded proprietary information.  Purchaser shall be responsible for any breach of this Section 7.2 by any of the Purchaser Recipients and agrees, at its sole expense, to take all reasonable measures (including, without limitation, court proceedings) to restrain the Purchaser Recipients from prohibited or unauthorized disclosure or use of such proprietary information.

### 7.3    Notification of Certain Events.

The Purchaser shall give the Seller immediate notice of the occurrence of any event or events which constitute a violation of any of the provisions of this Article VII.

# VIII

## AGREEMENTS OF PURCHASER AND SELLER

### 8.1    Employees.

18

The Purchaser shall not be acquiring any employees of the Seller at or on the Closing Date and makes no representation either expressed or implied that it intends to do so. The Seller shall be solely responsible for all severance pay, vacation pay and other benefits due its employees through the date of their termination. After the Closing, Purchaser may negotiate with and hire any employees of Seller who are no longer employed by the Seller.

8.2    "AS IS" Transaction.

PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE IV AS MODIFIED BY THE SCHEDULES, THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PROPERTY INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE TRANSFERRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE TRANSFERRED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER ASSIGNED CONTRACT, THE VALUE OF THE TRANSFERRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF TRANSFERRED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE TRANSFERRED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE TRANSFERRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE TRANSFERRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE TRANSFERRED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT IT HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE TRANSFERRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE TRANSFERRED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE TRANSFERRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE IV AS MODIFIED BY THE SCHEDULES HEREOF, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE TRANSFERRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.3    No Financing and Due Diligence Contingencies for Purchaser.

Purchaser agrees that its obligations under this Agreement are not subject to the satisfaction of any financing or due diligence contingencies.

19

## IX

## CONDITIONS PRECEDENT TO THE PURCHASER'S OBLIGATIONS

The obligations of the Purchaser to purchase and accept transfer and delivery of the Transferred Assets and to accept the assignment of the Assigned Contracts and to assume the Assumed Liabilities with respect thereto are subject to the satisfaction on or, where appropriate, prior to, the Closing Date, of the following conditions, except to the extent that any such condition may have been waived in writing by the Purchaser on or prior to the Closing Date:

9.1     Truth of Representations and Warranties.

The representations and warranties of the Seller contained in this Agreement or in any of the other Acquisition Documents shall have been true and correct in all material respects when made and in addition shall be true and correct in all material respects at and as of the Closing and with the same effect as though made at and as of the Closing (except as otherwise contemplated by this Agreement), except to the extent such representations and warranties expressly relate to an earlier date.

9.2     Performance.

The Seller shall have performed and complied in all material respects with all agreements, covenants, obligations and conditions required by this Agreement or any of the other Acquisition Documents to be performed or complied with by the Seller at or prior to the Closing.

9.3     Approvals.

All Approvals from all Governmental Authorities and other Persons listed on Schedule 4.10(a) shall have been given, made or obtained, as appropriate, and shall be in full force and effect.

9.4     Absence of Litigation.

To the Seller's Knowledge, there shall be no Action pending or threatened before any court or other Governmental Authority which seeks to (a) invalidate or set aside, in whole or in part, this Agreement or any of the other Acquisition Documents or (b) restrain, prohibit, invalidate or set aside, in whole or in part, the consummation of the transactions contemplated hereby and thereby.

9.5     Deliveries.

The Seller shall have executed and/or delivered to the Purchaser, at or prior to the Closing the following:

(a)     the Bill of Sale, attached hereto and made a part hereof as Exhibit C;

(b)     the Assignment Agreements;

(c)      such certificates of the Chief Executive Officer of the Seller to evidence compliance with the conditions set forth in Sections 9.1 through 9.5 hereof and any other certificates to evidence compliance with the conditions set forth in this Article IX as may be reasonably requested by the Purchaser or its counsel; and

(d)      such other bills of sale, assignments and instruments of transfer in form and substance satisfactory to the Purchaser, as shall be necessary to vest in the Purchaser all the Seller's right, title and interest in, to and under the Transferred Assets.

9.6      <u>Approval Order</u>.  The Approval Order remains in full force and effect and has not been stayed or modified in any manner, except as consented to by the Purchaser and the Seller.

# X

## CONDITIONS PRECEDENT TO THE SELLER'S OBLIGATIONS

The obligations of the Seller to sell, transfer and deliver the Transferred Assets and to assign to the Purchaser the Assigned Contracts are subject to the satisfaction on or, where appropriate, prior to the Closing Date, of the following conditions, except to the extent that any such condition may have been waived in writing by the Seller on or prior to the Closing Date:

10.1      <u>Truth of Representations and Warranties</u>.

The representations and warranties of the Purchaser contained in this Agreement or in any of the other Acquisition Documents shall be true and correct in all material respects when made and in addition shall be true and correct in all respects at and as of the Closing and with the same effect as though made at and as of the Closing (except as otherwise contemplated by this Agreement).

10.2      <u>Performance</u>.

The Purchaser shall have performed and complied in all material respects with all agreements, covenants, obligations and conditions required by this Agreement and the other Acquisition Documents to be performed or complied with by it at or prior to the Closing.

10.3      <u>Approvals</u>.

All Approvals from all Governmental Authorities and those Persons listed on <u>Schedule 4.10(a)</u> shall have been given, made or obtained, as appropriate, and shall be in full force and effect.

10.4      <u>Absence of Litigation</u>.

There shall be no Action pending or threatened before any court or other Governmental Authority with respect to the Purchaser which seeks to (a) invalidate or set aside, in whole or in part, this Agreement or any of the other Acquisition Documents or (b) restrain, prohibit, invalidate or set aside, in whole or in part, the consummation of the transactions contemplated hereby or thereby.

21

Exhibit A - 44

10.5     Deliveries.

The Purchaser shall have executed and/or delivered to the Seller, at or prior to the Closing, the following:

(a)     the Closing Purchase Price in accordance with Section 2.6 hereof; and the Assignment Agreements;

(b)     the Post-Closing Occupancy Payment.

(c)     such certificates of the Chief Executive Officer of the Purchaser to evidence compliance with the conditions set forth in Sections 10.1 through 10.5 hereof and any other certificates to evidence compliance with the conditions set forth in this Article X as may be reasonably requested by the Seller or its counsel; and

(d)     such other agreements, undertakings and instruments of assumption, in form and substance reasonably satisfactory to the Seller, as shall be necessary to cause the Assumed Liabilities to be binding on the Purchaser and such other documents or certificates as shall be reasonably requested by the Seller or its counsel.

10.6     Approval Order.  The Approval Order remains in full force and effect and has not been stayed or modified in any manner, except as consented to by the Seller and the Purchaser.

### XI

### COVENANTS AND AGREEMENTS SUBSEQUENT TO THE CLOSING

11.1     Books and Records; Access.

Unless otherwise consented to in writing by Representatives of the Seller, for a period of five (5) years after the Closing Date, the Purchaser shall not destroy or otherwise dispose of any original Books and Records which it receives on or after the Closing Date relating to the Business or the Transferred Assets prior to the Closing or the Assumed Liabilities without first offering to surrender such Books and Records to the Seller, and shall maintain such Books and Records in good condition in a reasonably accessible location.  Upon reasonable prior notice, the Purchaser shall afford the Representatives of the Seller reasonable access during normal business hours to examine and copy such Books and Records for any reasonable purpose relating to the Business through the Closing Date.

11.2     Confidentiality.

From and after the Closing, the provisions of Sections 6.4 and 7.2 shall continue in effect; provided that the Purchaser shall not be restricted with respect to any proprietary information relating to the Transferred Assets or the Business and the Seller shall be restricted with respect to such proprietary information as if it had originally been the property of, and been acquired by the Seller from, the Purchaser.  Notwithstanding the foregoing, following the Closing, the Seller shall be entitled to disclose such information as may reasonably be required in

22

connection with its year-end accounting requirements, the preparation of Tax Returns and reports or documents to be filed with any regulatory agency or for any other reasonable purpose, including, without limitation, in connection with tax audits for periods prior to and including the Closing Date.

11.3　Specific Performance; Injunctive Relief.

Each of the parties hereto acknowledges, understands and agrees that any breach or threatened breach by it or any of its Representatives of Sections 6.4 or 7.2 hereof will cause irreparable injury to the other party and that money damages will not provide an adequate remedy therefore. Accordingly, in the event of any such breach or threatened breach, the non-breaching party shall have the right and remedy (in addition to any other rights or remedies available at law or in equity) to have the provisions of such Sections specifically enforced by, and to seek injunctive relief and other equitable remedies in, any court having competent jurisdiction.

11.4　Further Assurances.

In addition to the actions, documents, files, pleadings and instruments specifically required to be taken or delivered by this Agreement or the other Acquisition Documents, whether on or before or from time to time after the Closing, and without further consideration, each party hereto shall take such other actions, and execute and/or deliver such other documents, data, pleadings, files, information and instruments, as the other party hereto or its counsel may reasonably request in order to effectuate and perfect the transactions contemplated by this Agreement and the other Acquisition Documents, including without limitation, such actions as may be necessary to Transfer to the Purchaser and to place the Purchaser in possession or control of, all of the rights, properties, assets and businesses intended to be sold, Transferred, conveyed, assigned and delivered hereunder, or to assist in the collection of any and all such rights, properties and assets or to enable the Purchaser to exercise and enjoy all rights and benefits of the Seller with respect thereto.

11.5　Collection of Payments.

Following the Closing Date, except as otherwise provided in this Agreement,

(a)　the Purchaser shall hold in trust and forward to the Seller any payments received by the Purchaser related to the Excluded Assets and Seller shall hold in trust and forward to the Purchaser any payments received by the Seller related to the Transferred Assets including but not limited to any Accounts Receivable, in each case within one (1) week of receipt of any such payment by the Purchaser or the Seller, as the case may be, and

(b)　the Purchaser shall promptly deliver to the Seller any mail or communications received by the Purchaser relating to Excluded Assets and Excluded Liabilities and the Seller shall promptly deliver to the Purchaser any mail or other communications received by the Seller relating to the Transferred Assets or the Assumed Liabilities.

11.6　Name Change.

23

From and after the Closing Date, the Seller shall cease use of the corporate name "Penta Water Company, Inc." or any names similar thereto, and not later than thirty (30) days following the Closing Date, the Seller shall deliver to the Purchaser evidence of the change of the corporate name of the Seller to a name dissimilar to "Penta Water Company, Inc."

    11.7   <u>Maintenance of the Facilities; Retrieval of Transferred Assets</u>.

Seller agrees to maintain its occupancy of the Facilities and any other location where Transferred Assets are located until May 31, 2010 ("<u>Vacancy Date</u>") and Purchaser agrees that it will remove all Transferred Assets from the Facilities and such other locations at its sole cost and expense prior to such date. Seller shall also notify Purchaser no less than five (5) Business Days prior to the Closing of the location of any Transferred Assets which will not be located at the Facilities at the Effective Time. Purchaser agrees to pay to Seller the sum of One Thousand Dollars ($1,000) per day for each day from and after the Closing Date through the Vacancy Date ("<u>Post-Closing Occupancy Payment</u>"). Post-Closing Occupancy Payment shall cover the costs and expenses incurred by Seller in maintaining the Facilities from and after the Closing Date through the Vacancy Date, including but not limited to all rent, utility charges, property taxes and insurance premiums due thereon.

**XII**

**SURVIVAL**

The representations and warranties of the parties hereto contained in this Agreement shall not survive the Closing hereunder. The covenants and agreements of the parties hereto contained in this Agreement shall survive until fully performed or fulfilled (unless non-compliance with such covenants or agreements is waived in writing by the party or parties hereto entitled to such performance).

**XIII**

**TERMINATION**

    13.1   <u>Termination</u>.

This Agreement may be terminated at any time prior to the Closing by:

    (a)   by the mutual written consent of the Purchaser and the Seller;

    (b)   by the Seller, upon no less than three (3) Business Days prior written notice, if there shall have been a material breach by the Purchaser of any of the representations, warranties, covenants or other obligations of the Purchaser under this Agreement which shall not have been waived by the Seller and which breach cannot be cured by within ten days (10) after the Closing Date; and

    (c)   by either the Purchaser or the Seller, upon no less than three (3) Business Days prior written notice, if there shall have been a material failure by the other Party of any of the conditions precedent set forth in Article X or Article XI , as the case may be, which failure

24

shall not have been waived by the non-breaching party and which failure cannot be cured by within ten days (10) after the Closing Date and the party seeking to terminate hereunder is not in breach of this Agreement; provided, however, in the event that Purchaser fails to deliver the Closing Purchase Price, and the Seller is not then in breach of the Agreement or has otherwise failed to be in a position to timely satisfy any of its conditions precedent at the Closing, the Seller may terminate the Agreement immediately, upon written notice to the Seller.

    13.2    <u>Effect of Termination.</u>

    (a)    In the event of the termination of this Agreement pursuant to Section 13.1(a) or 13.1(c), as a result of Seller's failure to satisfy any of its conditions precedent to Closing by the Purchaser, such termination shall be the sole remedy, and: (i) except with respect to Section 6.4, Section 7.2, this Section 13.2, Section 14.1, Section 14.2 , Section 14.3 and Sections 14.5 through 14.11 hereof this Agreement shall forthwith become void and of no further force or effect; (ii) there shall be no liability on the part of the Seller, the Purchaser or any of their respective Representatives and (iii) Purchaser shall receive the Deposit from JMBM upon delivery to JMBM of either: (A) joint written instructions from the Seller and the Purchaser or (B) a Bankruptcy Court Order requiring such disbursement.

    (b)    If this Agreement is terminated pursuant to Section 13.1(b) as a result of Purchaser's breach or Section 13.1(c) of this Agreement, as a result of Purchaser's failure to satisfy any of its conditions precedent to Closing by the Seller, the Seller shall receive the Deposit from JMBM upon delivery to JMBM written instructions from the Seller without the necessity of application to or entry of an Order of the Bankruptcy Court requiring such disbursement; provided, however, nothing contained in this Section 13.2(b) or elsewhere this Agreement, shall limit any rights or remedies which may be available to Seller in the event of any termination of this Agreement as a result of the Purchaser's breach of this Agreement.

XIV

**MISCELLANEOUS**

    4.1    <u>Public Announcements.</u>

    Except as required by applicable Law or any Governmental Authority with competent jurisdiction, prior to the Closing, none of the parties hereto, nor their Representatives, shall issue any press release or make any public announcement or disclosure with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld or delayed.

    14.2    <u>Amendment; Waiver.</u>

    Neither this Agreement, nor any of the terms or provisions hereof, may be amended, modified, supplemented or waived except by a written instrument signed by all of the parties hereto (or, in the case of a waiver, by the party granting such waiver). No waiver of any of the terms or provisions of this Agreement shall be deemed to be or shall constitute a waiver of any other term or provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. No failure of a party hereto to insist upon strict compliance by another party

25

hereto with any obligation, covenant, agreement or condition contained in this Agreement shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of a party hereto, such consent shall be given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 14.2.

      14.3   Fees and Expenses.

Except as otherwise expressly provided in this Agreement, each of the parties hereto shall bear and pay all fees, costs and expenses incurred by it or any of its Affiliates in connection with the origin, preparation, negotiation, execution and delivery of this Agreement and the other Acquisition Documents and the transactions contemplated hereby or thereby (whether or not such transactions are consummated), including, without limitation, any fees, expenses or commissions of any of its Representatives.

      14.4   Notices.

      (a)    All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and mailed or facsimiled or delivered by hand or courier service:

        If to the Seller, to:

          _____

          Chief Executive Officer
          Penta Water Company, Inc.
          2091 Rutherford Road
          Carlsbad, CA 92008
          Fax:  (___) ___-____

        With a copy to:

          Jeffer, Mangels, Butler & Marmaro LLP
          1900 Avenue of the Stars
          Los Angeles, CA  90067
          Fax:  (310) 203-0567
          Attention: Joseph A. Eisenberg, P.C.

        If to the Purchaser to:

          _____

          _____

          _____
          Fax:  (___) ___-____
          Attention:  _____

          _____

        With a copy to:

_____

_____

_____

Fax: (___) ___-_____
Attention: _____, Esq.

(b)    All notices and other communications required or permitted under this Agreement which are addressed as provided in Section 14.4(a) if delivered personally against proper receipt or by confirmed facsimile transmission shall be effective upon delivery or if delivered (i) by certified or registered mail with postage prepaid shall be effective five (5) Business Days or (ii) by Federal Express or similar courier service with courier fees paid by the sender, shall be effective two (2) Business Days following the date when mailed or couriered, as the case may be.  Any party hereto may from time to time change its address for the purpose of notices to such party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

14.5    Assignment.

This Agreement and all of the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Prior to the Effective Time, neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by the Seller or the Purchaser; provided, however, that the Purchaser shall be entitled, upon written notice to Seller but without the consent of the Seller, to assign any or all of its rights, interests and obligations to a wholly owned subsidiary or an Affiliate; provided, however, that in the event of such an assignment the Purchaser will remain bound by the terms, obligations and conditions of this Agreement.  Any assignment made in contravention of the terms of this Section 14.5 shall be void ab initio.

14.6    Governing Law; Consent to Jurisdiction.

(a)    This Agreement and the legal relations among the parties hereto shall be governed by and interpreted in accordance with, the laws of the State of California applicable to agreements made and to be performed entirely within such State.

(b)    Until the entry of an order either closing or dismissing the Bankruptcy Case, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

(c)    After the entry of an order either closing or dismissing the Bankruptcy Case, each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of any California state or federal court sitting or located in the County of Los Angeles (a "California Court") in any Action arising out of or relating to this Agreement or the other Acquisition Documents, and each such party hereby irrevocably agrees that all claims in respect of such Action shall be heard and determined in such California Court.  Each party, to the extent permitted by applicable Laws, hereby expressly waives any defense or objection to jurisdiction or venue based on the doctrine of forum non conveniens, and stipulates that any California Court

27

shall have in personam jurisdiction and venue over such party for the purpose of litigating any dispute or controversy between the parties arising out of or related to this Agreement or the other Acquisition Documents. In the event any party shall commence or maintain any Action arising out of or related to this Agreement in a forum other than a California Court, the other party shall be entitled to request the dismissal or stay of such Action, and each such party stipulates for itself that such Action shall be dismissed or stayed. To the extent that any party to this Agreement has or hereafter may acquire any immunity from jurisdiction of any California Court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, each such party hereby irrevocably waives such immunity. After the entry of an order either closing or dismissing the Bankruptcy Case, each party irrevocably consents to the service of process of any of the California Courts in any such Action by any means permitted by the rules applicable in such California Court including, if permissible, personal delivery of the copies thereof or by the mailing of the copies thereof by certified mail, return receipt requested, postage prepaid, to it as its address specified in accordance with Section 14.4(a) above, such service to become effective upon the earlier of (i) the date ten (10) calendar days after such mailing or (ii) any earlier date permitted by applicable Law.

14.7    WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER ACQUISITION DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER ACQUISITION AGREEMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 14.7.

14.8    Entire Agreement.

This Agreement and the other Acquisition Documents embody the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, commitments, arrangements, negotiations or understandings, whether oral or written, between the parties hereto, their respective Affiliates or any of the Representatives of any of them with respect thereto. There are no agreements, covenants or undertakings with respect to the subject matter of this Agreement and the other Acquisition Documents other than those expressly set forth or referred to herein or therein and no representations or warranties of any kind or nature whatsoever, express or implied, are made or shall be deemed to be made herein by the parties hereto except those expressly made in this Agreement and the other Acquisition Documents.

14.9    Severability.

Each term and provision of this Agreement constitutes a separate and distinct undertaking, covenant, term and/or provision hereof. In the event that any term or provision of this Agreement shall be determined to be unenforceable, invalid or illegal in any respect, such unenforceability, invalidity or illegality shall not affect any other term or provision hereof, but this Agreement shall be construed as if such unenforceable, invalid or illegal term or provision had never been contained herein. Moreover, if any term or provision of this Agreement shall for any reason be held to be excessively broad as to time, duration, activity, scope or subject, the parties request that it be construed, by limiting and reducing it, so as to be enforceable to the fullest extent permitted under applicable Law.

14.10   No Third Party Beneficiaries.

Except as and to the extent otherwise provided herein, nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their respective successors and permitted assigns.

14.11   Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed as of the day and year first above written.

PENTA WATER COMPANY, INC.

By:
Name: _____
Title:   Chief Executive Officer

_____

By:_____
Name: _____
Title: _____

30

Exhibit A - 53

**LIST OF EXHIBITS AND SCHEDULES**

| | |
|---|---|
| Exhibit A | Assigned Contracts |
| Exhibit B | Form of Assignment Agreements |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Approval Order |
| Schedule 2.1(c) | Transferred Equipment |
| Schedule 2.1(d) | Intangible Assets |
| Schedule 2.1(e) | Inventory |
| Schedule 2.1(f) | Open Purchase Orders |
| Schedule 2.1(g) | Other Personalty |
| | |
| Schedule 4.3 | Permitted Violations |
| Schedule 4.4 | Permitted Defaults Under Assigned Contracts |
| Schedule 4.5 | Intellectual Property and License Agreements |
| Schedule 4.6 | Actions |
| Schedule 4.7 | Permitted Non-Compliance with Laws |
| Schedule 4.8 | Permitted Title Exceptions |
| Schedule 4.9(a) | Approvals |
| Schedule 4.10(a) | Permitted Environmental Violations |
| Schedule 4.13 | Damaged Inventory |

Exhibit List

Exhibit A - 54

# EXHIBIT A

## ASSIGNED CONTRACTS

A-1

**EXHIBIT B**

<u>Form of Assignment Agreements</u>

See Attached

B-1

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed as of _____, ___, by and between_____, a _____ or its wholly-owned designee ("Assignee"), and Penta Water Company, Inc., a _____ corporation ("Assignor"). Capitalized terms used but not defined herein shall have the meanings given to them in that certain Asset Purchase Agreement dated as of _____, ____ (the "Purchase Agreement"), among Assignee and Assignor.

1.      Assignor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby grants, transfers, sells, conveys, assigns and delivers to Assignee, free and clear of Liens, all of Assignor's right, title and interest in and to all of the Assigned Contracts, including but not limited to those listed in Exhibit A attached hereto and made a part hereof.

2.      The Assignee shall assume and agree to pay, perform, discharge and satisfy when due only the Assumed Liabilities listed in Exhibit B hereto and made a part hereof.

3.      Notwithstanding anything to the contrary contained herein, this Agreement shall be void ab initio and shall not have any force or effect if the transactions contemplated under the Purchase Agreement are not consummated.

4.      The assignments and assumptions made hereunder are made in accordance with and subject to the representations, warranties, covenants, limitations, and provisions contained in the Purchase Agreement.

5.      This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto, their successors in interest, administrators, legal representatives and permitted assigns.

6.      Each of the parties hereto agree that it will at any time and from time to time after the date hereof, on the written request of the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged or delivered, all such further documents, acts and assurances as may be reasonably requested by the requesting party to implement and give effect to the Purchase Agreement and this Agreement.

7.      This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute a single agreement.

8.      If there is a conflict between the language of this Agreement and the language of the Purchase Agreement, the language of the Purchase Agreement will prevail.

[Remainder of page intentionally left blank.]

6594579v13

IN WITNESS WHEREOF, Assignor and Assignee have caused this Agreement to be duly executed as of the date first written above.

**PENTA WATER COMPANY, INC.**

**By:** _____

— _____

**By:** _____

B-3

Exhibit A - 58

FORM OF TRADEMARK ASSIGNMENT AGREEMENT

6594579v13

## EXHIBIT C

FORM OF BILL OF SALE

**BILL OF SALE**

This Bill of Sale is made and executed as of _____, ____ by PENTA WATER COMPANY, INC., a California corporation ("Seller"), in favor of_____ a _____ or its wholly-owned designee ("Purchaser").

## RECITALS

WHEREAS, Purchaser and Seller, among others, have entered into that certain Asset Purchase Agreement, dated _____, ____ (the "Agreement"), pursuant to which, among other things, Seller desires to transfer, sell, convey, assign and deliver to the Purchaser, and the Purchaser desires to acquire from the Seller, certain assets of the Seller, in accordance with the terms and subject to the conditions of the Agreement. All capitalized terms not defined herein shall have the same meanings as set forth in the Agreement.

## AGREEMENT

NOW, THEREFORE, Seller hereby agrees as follows:

For good and valuable consideration, receipt of which is hereby acknowledged, Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser all of Seller's right, title and interest in and to the Transferred Assets, as such term is defined in the Agreement, including but not limited to those Transferred Assets set forth in the Schedules to the Agreement described on Exhibit A attached hereto and incorporated herein by this reference, free and clear of all liens, security interests and encumbrances except as otherwise provided in the Agreement. Seller, at any time at or after the date hereof, will execute, acknowledge and deliver any further deeds, assignments, conveyances and other assurances, documents, and instruments of transfer reasonably requested by Purchaser and will take any other action consistent with the terms of the Agreement and this Bill of Sale that may reasonably be requested by Purchaser for the purpose of assigning, transferring, granting, conveying and confirming to Purchaser, or reducing to possession, any or all of the Transferred Assets.

Seller hereby irrevocably nominates, constitutes and appoints Purchaser the true and lawful attorney-in-fact of Seller, with full power of substitution, and hereby authorizes Purchaser, in the name and on behalf of Seller, to execute, deliver, acknowledge, certify, file and record (in the name of Seller or otherwise) any document that Purchaser may in its sole discretion deem appropriate for the purpose of (i) collecting, asserting, enforcing or perfecting any claim, right, title or interest of any kind that is included in or relates in any way to any of the Transferred Assets, (ii) defending or compromising any arbitration, suit, litigation or proceeding relating in any way to any of the Transferred Assets, or (iii) otherwise carrying out or facilitating any of the transactions contemplated by the Agreement; provided that Purchaser is not authorized to and shall not admit or incur (or cause to be admitted or incurred) any liability or obligation of Seller. The foregoing powers are and shall be coupled with an interest and shall be irrevocable and shall survive the liquidation and dissolution of Seller.

C-1

This Bill of Sale is subject to, and shall be construed in accordance with, the Agreement, and in the event of a conflict between the provisions of this Bill of Sale and the provisions of the Agreement (insofar as such provisions relate to the rights and obligations of Purchaser, on the one hand, and Seller, on the other hand), the provisions of the Agreement shall prevail.

IN WITNESS WHEREOF, this Bill of Sale has been executed by a duly authorized officer of Seller as of the day and year first above written.

PENTA WATER COMPANY, INC.,

a California corporation

By:_____

Its:_____

6594579v13

Exhibit A - 61

**<u>EXHIBIT D</u>**

APPROVAL  ES PROCEDURES ORDER

1   JOSEPH A. EISENBERG P.C. (Bar No. 52346)
    THOMAS M. GEHER (Bar No. 130588)
2   JEFFER, MANGELS, BUTLER & MARMARO LLP
    1900 Avenue of the Stars, Seventh Floor
3   Los Angeles, California  90067-4308
    Telephone:    (310) 203-8080
4   Facsimile:    (310) 203-0567
    Email:        jae@jmbm.com
5
    Attorneys for Debtor and Debtor in Possession
6

7               **UNITED STATES BANKRUPTCY COURT**

8               **SOUTHERN DISTRICT OF CALIFORNIA**

9

10  In re                                    CASE NO.    09-15145-LT11

11  PENTA WATER COMPANY, INC., a California   Chapter 11
    corporation,
12                                           **PROOF OF SERVICE**
                    Debtor.
13

14

15

16

17          I, the undersigned, declare that I am over the age of eighteen years and not a party to this

18  cause.  I am employed in, or am a resident of, the County of Los Angeles, California, and my

19  business address is: 1900 Avenue of the Stars, Seventh Floor, Los Angeles, California  90067-4308.

20  On February 17, 2010, I caused to be served the following document(s):  **NOTICE OF MOTION**

21  **AND AUCTION SALE AND MOTION OF DEBTOR IN POSSESSION: (1) TO CONDUCT**

22  **AUCTION SALE OF CERTAIN ASSETS OF THE ESTATE; (2) FOR APPROVAL TO SELL TO**

23  **SUCCESSFUL BIDDER CERTAIN ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS,**

24  **CLAIMS, INTERESTS AND ENCUMBRANCES; (3) FOR A DETERMINATION THAT THE**

25  **SUCCESSFUL BIDDER FOR THE ASSETS IS A "GOOD FAITH" PURCHASER; AND (4) FOR**

26  **APPROVAL TO ASSUME AND ASSIGN TO SUCCESSFUL BIDDER CERTAIN EXECUTORY**

27  **CONTRACTS; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF**

28  **GREGORY L. PROBERT IN SUPPORT THEREOF.**

PRINTED ON
RECYCLED PAPER

3721534v1

1  ☒  (BY MAIL) Pursuant to that certain Order on Ex Parte Motion for Order (I) Limiting

2  Scope of Notice of Certain Matters Requiring Notice to All Creditors; and (II) Approving Form of

3  Notice of Order Limiting Notice, entered by the Court on January 19, 2010 (Docket No. 105), I

4  served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy

5  case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in

6  the United States Mail, first class, postage prepaid, addressed as follows:

7  **SEE ATTACHED SERVICE LIST**

8  I am "readily familiar" with the firm's practice for collection and processing correspondence for

9  mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day

10  with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

11  ☐  (BY FAX) I transmitted, pursuant to Rule 2.306, the above-described document by

12  facsimile machine (which complied with Rule 2003(3)), to the below-listed fax number(s).   The

13  transmission originated from facsimile phone number (310) 203-0567 and was reported as

14  complete and without error.

15  ☐  (BY OVERNIGHT DELIVERY) I caused said envelope(s) to be delivered overnight via

16  an overnight delivery service in lieu of delivery by mail to the addressee(s).

17  ☒  (BY E-MAIL OR ELECTRONIC TRANSMISSION): On February 17, 2010, checked the

18  "Mailing Information" for this bankruptcy case and confirm that the following people/entities are

19  currently on the list to receive e-mail notices for this case:

20  - Brian W. Byun      bbyun@jmbm.com
   - Caroline Djang      crd@jmbm.com
21  - Joseph A. Eisenberg      jae@jmbm.com
   - Haeji Hong      Haeji.Hong@usdoj.gov,
22    USTP.Region15@usdoj.gov;shannon.m.vencill@usdoj.gov;tiffany.l.carroll@usdoj.gov
23  - Natasha Johnson      natasha.johnson@dlapiper.com
   - Jennifer Nassiri      jennifer.nassiri@dlapiper.com
24  - Martina A. Slocomb      mslocomb@rutan.com
   - Adam M. Starr      starra@gtlaw.com
25  - United States Trustee      ustp.region15@usdoj.gov

26

27

28

PRINTED ON

RECYCLED PAPER

3721534v1

- 2 -

1   ☒    (FEDERAL)    I declare that I am employed in the office of a member of the bar of this

2  court at whose direction the service was made.

3  Executed on February 17, 2010 at Los Angeles, California.

5                             /s/ Claudean Brandon
                           Claudean Brandon

PRINTED ON

RECYCLED PAPER

3721534v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON

RECYCLED PAPER

3721534v1

## SERVICE LIST

**Served By U.S. Mail**

Secured Creditor
Gregory Probert
1440 St Albans Road
San Marino, CA 91108

Attorneys for the Official Committee of
Unsecured Creditors
Karol K. Denniston, Esq.
Natasha L. Johnson, Esq.
DLA Piper LLP (US)
550 South Hope Street, Suite 2300
Los Angeles, CA 90071-2678

Licensor
William Holloway
Aquaphontonics, Inc.
35309 N. 26th Avenue
Phoenix, AZ 85086

Randall S. Goulding
Law Offices of Randall S. Goulding
1333 Sprucewood
Deerfield, IL 60015

Nick Desai
Shackleton Equity Partners
10877 Wilshire Blvd., Suite 2000
Los Angeles, CA 90024

Jeffrey Nathan Pomerantz, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Suite 1100
Los Angeles, CA 90067

**REQUEST FOR SPECIAL NOTICE**

Attnys for Department of Revenue
Richard M. Maseles
Special Assistant Attorney General
Missouri Department of Revenue, Bankruptcy
Unit
PO Box 475
Jefferson City, MO 65105-0475

Attnys for Gregory Probert
Adam M. Starr
Greenberg Traurig, LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

Attnys for Gregory Probert
Duane D. Sitar
Greenberg Traurig, LLP
3290 Northside Parkway, Suite 400
Atlanta, GA 30327

Blower Dempsay Corp. dba Pak West Paper &
Packaging
c/o Martina S. Slocomb, Esq.
Rutan & Tucker, LLP
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, CA 92626-1931

Iron Mountain Information Management, Inc.
c/o Frank F. McGinn, Esq.
Bartlett Hackett Feinberg, P.C.
155 Federal St., 9th Fl.
Boston, MA 02110

**Government Entities**

Internal Revenue Service
Insolvency Group 1
880 Front Street
San Diego, CA 92101

U.S. Securities and Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036